Robert P. Goe - State Bar No. 137019
Charity J. Manee – State Bar No. 286481
**GOE FORSYTHE & HODGES LLP**
18101 Von Karman Avenue, Suite 1200
Irvine, CA 92612
rgoe@goeforlaw.com
cmanee@goeforlaw.com
Telephone:  (949) 798-2460
Facsimile:   (949) 955-9437

Attorneys for Judgment Creditor, Hymanson, Inc.

### UNITED STATES BANKRUPTCY COURT

### CENTRAL DISTRICT OF CALIFORNIA – LOS ANGELES DIVISION

|  |  |
|---|---|
| In re:<br><br>MAD DOGG ATHLETICS, INC, a California Subchapter S Corporation,<br><br>Debtor. | Chapter 11<br><br>Case No. 2:19-bk-18730-WB<br><br>**OMNIBUS REPLY IN SUPPORT OF HYMANSON, INC. dba BODYBLADE'S MOTION FOR ORDER UNDER 11 U.S.C. §§ 503(b)(3)(B) FOR AUTHORIZATION TO PURSUE ACTIONS (AND OBTAIN COMPENSATION FROM ESTATE) AGAINST THE FOLLOWING FOR THE BENEFIT OF THE ESTATE**:<br><br>1. **JOHN BAUDHUIN, AN INDIVIDUAL**<br>2. **SYRAC, LLC**<br>3. **HART WOOD INC.**<br>4. **MAD DOGG ATHLETICS EUROPE**<br>5. **SPINNING GROUP, INC.**<br>6. **AVERCARY, LLC**<br>7. **PORSCHE FINANCIAL SERVICES**<br>8. **SECOND DECADE LLC**<br>9. **PHOENIX TO LA, LLC, AND**<br>10. **ANY OTHER INSIDERS**<br><br>**DECLARATION OF KENNETH D. WATNICK FILED IN SUPPORT THEREOF**<br><br>**Hearing**:<br>Date:        January 23, 2020<br>Time:        10:00 a.m.<br>Place:       Courtroom 1375<br>               255 E. Temple St.<br>               Los Angeles, CA 90012 |

Judgment creditor Hymanson, Inc., dba Bodyblade ("Hymanson" or "HI"), files its reply to the oppositions[1] of chapter 11 debtor and debtor in possession Madd Dogg Athletics, Inc.'s ("Debtor"), insider John Baudhuin ("Baudhuin"), and the Official Committee of Unsecured Creditors ("Committee") to Hymanson's motion ("Motion") for an order under 11 U.S.C. § 503(b)(3)(B) for authorization to pursue actions (and obtain reimbursement from the estate for itself and its counsel pursuant to Section 503(b)(3)(b) and (b)(4)) against the following for the benefit of the Debtor's bankruptcy estate: (1) John Baudhuin ("Baudhuin"), (2) Syrac, LLC ("Syrac"), (3) Hart Wood, Inc. ("Hart Wood"), (4) Mad Dogg Athletics Europe ("MDAE"), (5) Spinning Group, Inc. ("SGI"), (6) Avercary, LLC ("Avercary"), (7) Porsche Financial Services, (8) Second Decade, LLC ("Second Decade"), (9) Phoenix to LA, LLC ("PtoLA"), and (10) any other insiders (collectively referred to, at times, as the "Insiders").

## I.    INTRODUCTION

Notwithstanding having been examined pre-petition under oath about these very transactions and <u>subpoenaed</u> to produce all relevant records, Baudhuin now asserts (with the backing of the Debtor and Committee, in their collaboratively prepared Oppositions) that the seven hundred thousand dollars of transfers from the Debtor to Baudhuin when Hymanson's petition to confirm its arbitration award was pending were on account of fully-documented "bridge" loans to the Debtor.  In fact, in his judgment debtor examination conducted by Hymanson on July 3, 2019, Baudhuin specifically disclaimed having made any such loans to the Debtor. Baudhuin and the Debtor (whose interests are completely aligned since Baudhuin is 100% in control of the Debtor) argue that the transfers to the Insiders detailed in the Motion were all above board, despite (1) the presence of numerous indicia of fraud, (2) countless interlocking and increasingly entangled relations between Baudhuin, the Debtor, and Baudhuin's other entities[2], and (3) Baudhuin's clear pattern of placing his interests above those of the Debtor and its creditors, both pre- and post-petition.

---

[1] The oppositions of the Committee [Doc. 266], Baudhuin [Doc. 267], and Debtor [Doc. 268] shall collectively, at times, be referred to as the "Oppositions."

[2] Highlighting the complexity of these issues is the fact that it took the Debtor ten pages of single-spaced text to explain to the Committee in its letter why there is nothing to see here.

1    For these reasons, Baudhuin and the Debtor's nearly identical oppositions to the Motion

2    should be given very little weight.   It is telling, however, that the opposition of the Committee,

3    the only party not irreconcilably conflicted out of defending the legitimacy of the Insider transfers,

4    filed an opposition that is less than a page long and which lacks substance.[3]   The Committee's

5    decision not to join fully in Debtor and Baudhuin's positions or provide any evidence to support

6    its opposition, especially after receiving the extensive documentation and confidential briefing[4]

7    described in the Oppositions, is telling.

8    At the core of the Oppositions are the following three arguments[5]: (1) Hymanson fails to

9    identify or satisfy the "requirements" for the relief requested by the Motion, (2) granting the

10   Motion will interfere with Debtor's reorganization efforts, and (3) Hymanson is not the proper

11   party to bring claims against the Insiders.  Each of these arguments fails.

12   With respect to the first argument, the "requirements" for granting the Motion are easily

13   established.  The Opposing Parties admit a demand to act was made upon the Debtor (and

14   Committee, though none was required to the latter).  The Oppositions make it expressly clear that

15   the Debtor (and the Committee) refuses to take action (*see e.g.*, Section II(B)(3) of the Debtor's

16   opposition brief entitled "The Debtor's Refusal to Pursue Litigation is Justified").  The claims are

17   clearly colorable and the attempts in the Oppositions to require Hymanson to *prove* the claims

18   within the context of the Motion are not supported by the law.  Multiple indicia of fraud are

19   present with respect to the claims.  Finally, the totality of the circumstances and evidence available

20   to date (and confirmed by the Oppositions) demonstrates that it is a dereliction of duty for the

21   conflicted Debtor to fail to pursue the claims.

---

[3] The Committee essentially argues that Debtor's Plan should be the sole focus of the case for an indefinite period of time and that there is plenty of time to address the claims raised in the Motion.  Neither argument is true.

[4] The Debtor's letter to the Committee that is attached to its opposition interestingly insists on confidentiality and nondisclosure to Hymanson regarding the very transactions Hymanson has been raising throughout this case.  One wonders why the Debtor and Baudhuin would not have rushed to Hymanson to clear up its alleged misunderstanding of the facts rather than covertly attempting to explain the legitimacy of Baudhuin's actions to the Committee behind closed doors.  Perhaps this was because Hymanson is the only creditor who has begun looking behind the curtain with respect to Baudhuin's conduct and might be privy to facts that contradict Baudhuin's story, as borne out herein.

[5] The Committee only makes the second argument.

1        Secondly, granting the Motion will not interfere with Debtor's reorganization efforts.  The

2   Debtor argues that if the Motion is granted, it will be required to participate in discovery in the

3   ensuing litigation.  Yet, the Debtor admits that Hymanson may take the same discovery in

4   connection with the Disclosure Statement and Plan, or in connection with a Rule 2004 exam,

5   regardless of the ruling on the Motion.  Debtor further argues that allowing Hymanson to pursue

6   the claims will undermine the deal the Debtor is proposing in its Plan with Baudhuin (which

7   Baudhuin negotiated with himself).  There is no interference here because Debtor's proposed deal

8   was dead on arrival.  Debtor's Plan purports to grant a release to a non-debtor (Baudhuin) in

9   violation of Section 524(e) and established Ninth Circuit precedent.   Rather than interfering with

10   Debtor's reorganization, the recovery of hundreds of thousands of dollars (if not millions) to the

11   estate from Baudhuin's looting and undermining the Debtor will improve feasibility of any plan

12   and increase the dividend to creditors.

13        Finally, the Oppositions argue that Hymanson is conflicted and therefore cannot pursue

14   claims on behalf of the estate because Hymanson is defending its secured claim against the

15   Debtor's preference claim.  Coming from Baudhuin and the Debtor, who have been attempting to

16   force the Debtor to pay excessive insider compensation and default interest to Baudhuin post-

17   petition, among other things, this is a fairly ironic accusation.  It is Baudhuin's domination of the

18   Debtor that has led the Debtor to refuse to pursue any claims against Baudhuin.  And, because the

19   Committee is inexplicably supportive of or indifferent to this dereliction (much like the default

20   interest stipulation between Debtor and Baudhuin on cash collateral), it too refuses to act.  The

21   reality is that there is no other creditor who will step up to take on this work and Hymanson's

22   history with the Debtor and Baudhuin, including having already conducted invaluable discovery

23   pre-petition, renders it an ideal candidate for this work.

24        Finally, in light of the hundreds of pages of documents attached to the Debtor's opposition

25   which in many cases are being reviewed by Hymanson for the first time (out of apparently many

26   thousands of pages not provided), and in light of Debtor's filing of its complex Plan and

27   Disclosure Statement (littered with illegal provisions), if the Court is not inclined to grant the

28   Motion now, Hymanson requests that  the Court continue the hearing on Motion to coincide with

1    the hearing on the Disclosure Statement so Hymanson can further develop the record and take

2    discovery on the Motion or Disclosure Statement and Plan.

3    **II.    SUPPLEMENTAL FACTS**

4          Notwithstanding the statement of Baudhuin's counsel to the Court on December 17, 2019

5    at Debtor's hearing on its motion to use cash collateral that "Hymanson did take a judgment-

6    debtor examination.  As you heard, they don't need a 2004.  They have the information.  The

7    information's been out there," the Oppositions reveal a number of facts previously undisclosed to

8    Hymanson.  *See* relevant pages of transcript from November 26, 2019 cash collateral hearing,

9    attached to the declaration of Kenneth Watnick ("Watnick Declaration") as **<u>Exhibit "1"</u>**.  In fact,

10   during Debtor's judgment debtor's examination on July 3, 2019, Baudhuin testified and was

11   specifically questioned about loans between Baudhuin and the Debtor following a line of

12   questioning regarding payment of Baudhuin's spousal support obligations from company funds,

13   Baudhuin testified,

14          Q. Are there other payments made on behalf of you [Baudhuin] other than this?

15          A. No. That would be, as far as I can recollect, the only one that would be

16   somewhat recurring, and, again, more so from an administrative standpoint because I

17   travel.

18          Q. But you are saying that we then should see a corresponding reimbursement of

19   that amount?

20          A. No.  At any given time.  The company has owed me far more than I've owed the

21   company because of loans I made to the company.  So it simply – you know, the timing of

22   it is generally about the same or within months of another.

23          Again, it's just – yeah, it could be monthly.  It could be every three months.  But

24   generally my loan balance has exceeded -- the amounts I have lent the company have

25   exceeded the amounts that I have taken out of the company.

26          The company – so….

27          Q. So in any of these bank statements are we going to see payments from you?

28

1    A. There probably are payments.  Again, I don't recall specifically what dates and

2    amounts those would be.

3    Q. Because you are talking about loans by you.  **Did you personally make loans to**

4    **the company?**

5    A. **Not loans.**  More so – you know, if I were to – there are things like Keyman life

6    insurance that is charged to my loan.  And even though, you know, its for the benefit of the

7    company in case something happened to me, they are not deductible by the company

8    because if you deduct them, the proceeds in the event of my death would become taxable.

9    So, again, those are types of things that I guess could be charged to my loan

10    account which

11    *See* transcript from judgment debtor's examination at 31:15-32:25, **Exhibit "2"** to the Watnick

12    Declaration.

13    Additionally, in connection with the Order for Debtor to appear and be examined, Debtor

14    was required to produce,

15    27. Any DOCUMENTS that reflect debts, loans or transfers by YOU to John Baudhuin;
     Phoenix to LA, LLC, Syrac LLC; or any other entity owned or controlled by John
16    Baudhuin.

17    28. Any DOCUMENTS that reflect payments or transfers to YOU from John Baudhuin;
     Phoenix to LA, LLC; Syrac LLC; or any other entity owned or controlled by John
18    Baudhuin.

19    *See* **Exhibit "3"** to Watnick Declaration, Civil Subpoena (Duces Tecum) for Personal Appearance

20    and Production of Documents to John R. Baudhuin on behalf of Madd Dogg Athletics.

21    The alleged promissory notes from Debtor in favor of Baudhuin that are attached to

22    Debtor's opposition were not produced in response to the subpoena of Debtor, nor were these

23    alleged loans disclosed at the judgment debtor examination of Debtor.  Additionally, the

24    Opposition does not include evidence of the source of funding for these alleged "bridge loans," *i.e.*

25    that the money deposited into Debtor's accounts actually came from Baudhuin.  And, the

26    promissory notes are signed "as of" the date typed into the documents, so it is unclear when these

27    alleged notes were actually executed, leaving open the question of whether this was done

28    retroactively.

1    Moreover, the Independent Accountant's Review Report prepared for Debtor for the year

2    ending December 31, 2018 provides detailed historical data regarding Debtor's transactions

3    (including as far back as 2012) yet makes no mention of the $700,000 in alleged "bridge" loans

4    from Baudhuin to Debtor or the repayment of the same.  In note 1 of these financial statements

5    prepared in 2019 (i.e. *after* the "bridge loans"), it is explained in reference to Debtor's financial

6    hardship that "[m]anagement plans to obtain support from the stockholder," an unusual phrasing

7    considering the alleged loans already made within the year. *See* Financial Statements attached to

8    the Watnick Declaration as **Exhibit "4".**

9    Since these new facts are coming to light for the first time in connection with this Motion

10   and were not disclosed by Baudhuin under penalty of perjury or in response to the aforementioned

11   subpoena of Debtor, Hymanson reserves all rights to conduct further investigation regarding all

12   new evidence and/or to request additional time to do so.

13   **III.    ARGUMENT**

14       **A.    Hymanson Has Satisfied The Legal Standard For Granting The Motion**.

15   The Oppositions argue that Hymanson failed to set forth the legal requirements for

16   granting the Motion and that it failed to satisfy them.  Neither contention is true.  In fact, the four

17   elements cited by the Debtor and Baudhuin were the centerpieces of Hymanson's arguments in the

18   Motion and are easily satisfied.

19           1.    The Oppositions Admit Hymanson Demanded that Debtor Pursue the

20                Claims.

21   It is undisputed that Hymanson made demand on the Debtor and Committee, though no

22   demand was required of the Committee, to pursue the claims against the Insiders.

23           2.    Debtor Refuses to Pursue the Claims.

24   Within the same pleading, Debtor argues that "Hymanson cannot show the Debtor declined

25   its demand,"[6] and that "[t]he Debtor's Refusal to Pursue Litigation is Justified,"[7] which again, is

26   the title of an entire section of Debtor's opposition brief dedicated to this point.  There simply is

27

28   ---
     [6] *See* Debtor's opposition, page 1:26-27.
     [7] *Id*., at p. 10, line 14.

1  no question that Debtor (and the Committee) refuses to take up the litigation, particularly after its

2  lengthy arguments attempting to justify its decision to not do so at the behest of its controlling

3  owner.

4          3.      The Claims are Colorable and Recovery Will Benefit the Estate.

5          Debtor argues that Hymanson has not made a showing that there are colorable claims at

6  issue because it did not identify specific claims but then says, "the Disclosure Statement fully

7  discloses the alleged claims against the insiders and the positions of each of the Debtor and

8  Hymanson regarding the merits and demerits of those claims for all creditors to assess and make

9  their own determination." *See* Debtor's opposition, 12:11-14. If the Debtor cannot make out what

10 claims are alleged to exist, it is curious how it is able to analyze "each" of the claims "fully"

11 disclosed in its Disclosure Statement. Clearly, the claims are set forth with sufficient detail in the

12 Motion (and Hymanson's demand letter) for understanding of the basic nature of what is alleged,

13 though certain transfers may be recoverable under multiple theories.

14         None of the Oppositions set forth a definition of the term "colorable," but the plain English

15 definition of the word according to Merrian Webster is "seemingly valid or genuine," not 'certain

16 and beyond the shadow of any doubt,' as the opposing parties would lead this Court to believe. In

17 any event, the extent to which these claims are colorable is perhaps best illustrated by looking at

18 the number of indicia of fraud present. With respect to common law, Section 548 [and state law

19 statutes],

20         the more common circumstantial indicia of fraudulent intent at the time of the transfer are:
           (1) actual or threatened litigation against the debtor; (2) a purported transfer of all or
21         substantially all of the debtor's property; (3) insolvency or other unmanageable
           indebtedness on the part of the debtor; (4) a special relationship between the debtor and the
22         transferee; and, after the transfer, (5) retention by the debtor of the property involved in the
           putative transfer.
23
           The presence of a single badge of fraud may spur mere suspicion; the confluence of several
24         can constitute conclusive evidence of actual intent to defraud, absent "significantly clear"
           evidence of a legitimate supervening purpose.
25
   *Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 34 F.3d 800, 806 (9th Cir. 1994) (citations omitted)

26         Here, Debtor made many of the transfers when it was facing entry of judgment after losing

27 its arbitration case to Hymanson. Baudhuin now claims that the transfers to him were repayment

28 of loans but this story is undermined by the fact that he failed to disclose such loans when he

1  testified under penalty of perjury or in connection with a lawful subpoena.  And, Baudhuin

2  admitted in Debtor's judgment debtor's examination that the writing off of debts owed to Debtor

3  in favor of his other insider entities harmed the Debtor's financial position, which is also reflected

4  in the notes to Debtor's 2018 financial statements.  Debtor was in bankruptcy soon after the

5  transfers to the Insiders were made, which indicates insolvency and/or unmanageable indebtedness

6  on the part of the Debtor.  Finally, all of the transactions at issue were made for the benefit of the

7  Insiders (Baudhuin and his entities), over which Baudhuin retained control.  Again, Hymanson

8  need not prove its case here but there certainly is a confluence of several indicia of fraud.

9  Moreover, when these facts are considered within the context of actions taken by Baudhuin post-

10  petition that have blatantly been in his self-interest and not in the interest of the Debtor or its

11  creditors, including but not limited to the now-withdrawn request for massive insider

12  compensation/administrative claim priority status (that Debtor could not afford), the attempt to

13  extract default interest after taking out Union Bank (a loan Baudhuin personally guaranteed), and

14  most recently, the attempt to extract a legally prohibited plan release, there is ample cause to

15  conclude the claims are colorable.

16          4.       Inaction by the Debtor is a Dereliction of its Fiduciary Duties.

17          Based on the amount of money at issue (millions of dollars), the inconsistencies in

18  Baudhuin's story, and the conduct of Baudhuin in this case, the failure by the Debtor or

19  Committee to act is a dereliction of their fiduciary duties.  Because Debtor is under the exclusive

20  control of Baudhuin, it is being held hostage to his wishes and would not, even if it were to pursue

21  such litigation, be in the best position to do so, with Baudhuin essentially suing himself.  The

22  Committee's refusal to take up the litigation is less understandable but the reality is that it needs to

23  be done if Debtor is to remain in chapter 11.  Hymanson is the only creditor willing to do so.

24      **B.**      **Hymanson's Pursuit of the Claims Will Not Interfere With Debtor's**

25              **Reorganization Efforts**.

26          1.       The Plan is Patently Unconfirmable.

27          Debtor argues (a sentiment echoed by Baudhuin and the Committee) that "[w]ith a

28  settlement [baked into the Plan] of the claims between the Estate and the insiders pending, it

1    would be improper to permit Hymanson to commence litigation on those same claims purportedly

2    on the Estate's behalf."  The settlement in the Plan that is referenced in this sentence purports to

3    release the Insiders of all liability on account of the claims.  This provision alone renders the Plan

4    <u>patently unconfirmable</u>.  Indeed, Section 524(e) precludes Courts from discharging the liabilities

5    of non-debtors, such as Baudhuin.  11 U.S.C. § 524(e); *Resorts Int'l, Inc. v. Lowenschuss (In re*

6    *Lowenschuss)*, 67 F.3d 1394, 1401 (9th Cir. 1995) (holding that the Ninth Circuit has repeatedly

7    declined to recognize exceptions to the rule).  This ruling was recently reaffirmed by the Ninth

8    Circuit Court of Appeals when it stated,

> Other Circuits have held that a debtor's Chapter 11 bankruptcy plan may operate to discharge the debts of certain non-debtor third parties, provided the bankruptcy court has "accepted and confirmed [this discharge] as an integral part of reorganization." *In re A.H. Robins Co.*, 880 F.2d 694, 702 (4th Cir. 1989) (*quoting Republic Supply Co. v. Shoaf*, 815 F.2d 1046, 1050 (5th Cir. 1987)). We have rejected this construction of the Bankruptcy Code. While the bankruptcy court has broad powers to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title," 11 U.S.C. § 105(a), it cannot confirm a plan that does not comply with applicable Code provisions. 11 U.S.C. § 1129(a)(1). In general, 11 U.S.C. § 524(e) provides that "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." Thus, we have "repeatedly held, without exception," that, in a Chapter 11 proceeding, "§ 524(e) precludes bankruptcy courts from discharging the liabilities of non-debtors." *In re Lowenschuss*, 67 F.3d 1394, 1401 (9th Cir. 1995) (citations omitted).

*Deocampo v. Potts*, 836 F.3d 1134, 1143 (9th Cir. 2016).

        Therefore, the argument in the Oppositions that granting Hymanson standing to pursue the

claims will undermine the settlement attempted by the Plan fails because as a matter of law, such

settlement is not proper and the Debtor needlessly increases the administrative expenses of the

estate by proposing such illegal provisions.

                    2.    <u>Discovery Will Be Taken Regarding the Claims Regardless of the Outcome</u>
                          <u>of the Motion</u>.

        Debtor argues "Hymanson's proposed litigation also would distract the Debtor (separate

and apart from Baudhuin) and undermine the reorganization process.  With all the subject

transactions involving the Debtor, surely Hymanson will seek discovery from the Debtor and

otherwise drag it into the litigation.  This would both divert the Debtor from its reorganization

efforts and increase the Debtor's own administrative fees and costs."  *See* Debtor's opposition at

11:26-12:2.  This argument is undermined by Debtor's claims of extensive due diligence regarding

the claims.  For example, Debtor claims that it has "already investigated, evaluated…the claims"[8]

and that it,

> (a) reviewed, analyzed, and investigated the assertions in Hymanson's letter; (b) gathered, reviewed, and analyzed documents relating to the alleged transactions identified in that letter; (c) consulted and worked cooperatively with the Committee in gathering, organizing, and producing a substantial initial, and then a supplemental, set of documents, comprised of over 6,000 pages that, among other things, related to the alleged claims against the insiders; and (d) prepared, and on September 26, 2019, sent to the Committee (through counsel) an extensive letter regarding the alleged claims, detailing the facts and circumstances surrounding the underlying transactions with references to documents produced to the Committee.

Debtor's opposition, 5:8-16.

Based on the extensive investigation of the claims the Debtor purports to have done, it is difficult to understand Debtor's contention that litigation will impose any undue cost on the estate by the mere fact that Debtor may be called upon to respond to discovery of facts "fully" investigated by the Debtor already.  And, as acknowledged by the Debtor, such discovery may be propounded by Hymanson or any other creditor regardless of the outcome of this Motion.  *See* Debtor's opposition at 12:26-28 (Hymanson will "retain every right to conduct whatever relevant and appropriate discovery in connection with the Plan, these claims and their resolution under the Plan" even if the Motion is denied).

Additionally, as noted above and in the Motion, Hymanson is already very focused on the issues and evidence at play with respect to the claims and has already expended its own resources. Allowing Hymanson to litigate these valuable claims will provide savings to the estate, rather than an increase of expenses.

In sum, there is no basis supporting Debtor's argument that the litigation will unduly increase costs of estate administration.

### C.    Hymanson is the Proper Party to Assert the Claims.

The Oppositions make the specious argument that Hymanson is unqualified to assert the claims against the Insiders because it is defending the Debtor's preference action regarding Hymanson's secured claim.  Debtor alleges that Hymanson's defense of its secured claim

---

[8] See Debtor's opposition, 1:27-28.

1    "disqualifies Hymanson from representing the Estate in the alleged claims" because Hymanson

2    has "no incentive" to pursue the claims if it retains its secured position since it will receive

3    payment in full under the Plan.  Debtor's opposition 14:6-13.  Alternatively, the Debtor argues

4    that Hymanson is conflicted regardless of whether it is secured or unsecured because it has the

5    incentive to control "estate" claims to use them as leverage.  Baudhuin makes a slightly different

6    argument regarding Hymanson's conflicts, arguing that Hymanson will be forced to take

7    inconsistent positions in defending the preference action and litigation of the Insider claims with

8    respect to the date of Debtor's insolvency.  None of these arguments has merit.

9        First, it is ironic and frankly bold of *Baudhuin* to assert that Hymanson has conflicts in

10    pursuing the claims.  Baudhuin is entirely focused on shielding himself from liability on the

11    claims and unfortunately, by virtue of his absolute control of the Debtor, the Debtor also clearly is

12    unable to vigorously assert the rights of the estate.  Why the Committee is siding with the Debtor

13    and Baudhuin remains a bit more of a mystery, though the opposition of the Committee was not

14    even a full page and apparently is merely intended to signal to the Court that there is a united

15    front.  With respect to Baudhuin's clever but ultimately meritless insolvency argument, Baudhuin

16    need not be concerned about Hymanson taking inconsistent positions since, in asserting avoidance

17    actions on behalf of the estate pursuant to § 503(b)(3)(B), a creditor who obtains permission from

18    the court to recover property for the benefit of the estate sues in the name of the trustee (or DIP)

19    and has the same statutory standing as the trustee (or DIP).  *In re Godon, Inc*., 275 B.R. 555

20    (Bankr. E.D. Cal, 2002).  Moreover, Baudhuin's argument wrongly presumes insolvency will

21    necessarily be an issue, which is not the case if the transfers prove to have been made as part of a

22    scheme to hinder, delay or defraud creditors.  Regarding the Debtor's argument that Hymanson's

23    secured claim would be paid in full irrespective of recovering the transfers comprising the Insider

24    Claims, this is dubious speculation.  In any event, Hymanson has already proven to be

25    incentivized and diligent in its efforts and is willing to assume the risk described by Debtor since it

26    will be able to recoup its legal fees pursuant to § 503(b)(4).   Finally, Debtor's argument that

27    conferring standing on Hymanson would lend leverage to Hymanson is also speculation but if it

28    were true, would always be a risk when granting standing to a creditor under § 503(b)(3)(B).

1  Clearly, to the extent such a risk exists, courts have weighed it as secondary to the interests of the

2  estate in recovering valuable claims that a debtor refuses to pursue.

3        **D.**        **The Motion Does Not Seek Approval of Specific Fees Pursuant to Section**

4                **503(b)(4).**

5        Finally, Debtor claims the Motion seeks an award of fees.  It does not.  In the Motion,

6  Hymanson specifically states, "In turn, HI's counsel should be awarded its reasonable

7  compensation for its services in this regard, upon a motion(s) **to be filed at the appropriate**

8  **time**."  Motion at 13:8-10 (emphasis added).

9  **IV.    CONCLUSION**

10        For all of the foregoing reasons, the Court should enter an order authorizing Hymanson to

11  initiate and prosecute to judgment all actions against the Insiders and collection of accounts

12  receivable owing by Baudhuin's entities (as well as settle with Court approval) on behalf of and

13  for the estate's benefit.  Upon further application, the Court should approve reimbursement of

14  Hymanson's expenses, including its legal fees.

15                                    Respectfully submitted,

16
   Dated: January 16, 2020                    **GOE FORSYTHE & HODGES LLP**
17

18                                    By: */s/Robert P. Goe*
                                        Robert P. Goe, Attorneys for
19                                      Secured Creditor Hymanson, Inc., dba
                                        Bodyblade
20

21

22

23

24

25

26

27

28

## DECLARATION OF KENNETH D. WATNICK

I am counsel for creditor Hymanson, Inc., dba Bodyblade ("Hymanson"), a secured creditor in the above-captioned bankruptcy case of Mad Dogg Athletics, Inc. ("MDA" or "Debtor"). I represented Hymanson in obtaining a judgment against Debtor after arbitration and confirmed by the State Court in the original amount of $1,104,020.45, and pursuing collection of the same. I have personal knowledge of the facts alleged herein and if called upon as a witness, I could and would competently testify thereto. I make this declaration in support of Hymanson's reply in support of its Motion for Order Under 11 U.S.C. §§ 503(b)(3)(B) For Authorization to Pursue Actions (and Obtain Compensation from Estate) Against the following for the Benefit of the Estate: (1) John Baudhuin ("Baudhuin"), an individual (2) Syrac, LLC ("Syrac"), (3) Hart Wood, Inc. ("Hart Wood"), (4) Mad Dogg Athletics Europe ("MDAE"), (5) Spinning Group, Inc. ("SGI"), (6) Avercary, LLC ("Avercary"), (7) Porsche Financial Services, (8) Second Decade, LLC ("Second Decade"), (9) Phoenix to LA, LLC ("PtoLA"), and (10) Any Other Insiders (collectively referred to, at times, as the "Insiders"); ("Motion").

1.      Notwithstanding the statement of Baudhuin's counsel to the Court on November 26, 2019 at Debtor's hearing on its motion to use cash collateral that "Hymanson did take a judgment-debtor examination. As you heard, they don't need a 2004. They have the information. The information's been out there," the Oppositions reveal a number of facts previously undisclosed to Hymanson. True and correct copies of pertinent pages of transcript from November 26, 2019 cash collateral hearing are attached hereto as **Exhibit "1"**.

2.      True and correct copies of pertinent pages of the transcript from judgment debtor's examination, at 31:15-32:25, are attached hereto and incorporated herein as **Exhibit "2"**.

3.      A true and correct copy of the Civil Subpoena (Duces Tecum) for Personal Appearance and Production of Documents served on John R. Baudhuin on behalf of Madd Dogg Athletics is attached hereto and incorporated herein as **Exhibit "3"**.

1    4.    A true and correct copy of the Independent Accountant's Review Report prepared

2  for Debtor for the year ending December 31, 2018 that was provided to me in connection with

3  Debtor's judgment debtor examination and attached hereto as **Exhibit "4".**

4        I declare under penalty of perjury under the laws of the United States of America that the

5  foregoing is true and correct.

6

Dated:  December 20, 2019    _____

7                                     Kenneth D. Watnick

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

# EXHIBIT 1

1          UNITED STATES BANKRUPTCY COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3                   --oOo--

4   In Re:                    ) Case No. 2:19-bk-18730-WB
                              )
5   MAD DOGG ATHLETICS, INC., ) Chapter 11
                              )
6        Debtor.             ) Los Angeles, California
    _____) Tuesday, November 26, 2019
7                              10:00 a.m.

8                             DEBTOR'S EMERGENCY MOTION FOR
                              INTERIM AND FINAL ORDERS
9                             AUTHORIZING USE OF CASH
                              COLLATERAL, AND APPROVAL OF
10                            STIPULATION WITH UNION BANK
                              REGARDING USE OF CASH
11                            COLLATERAL

12            TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE JULIA BRAND
13          UNITED STATES BANKRUPTCY JUDGE

14  APPEARANCES:

15  For the Debtor:           CATHY TA, ESQ.
                              Sulmeyer Kupetz, APC
16                            333 South Grand Avenue
                              Suite 3400
17                            Los Angeles, California 90071
                              (213) 626-2311
18

19  For the Creditors         ANDY S. KONG, ESQ.
      Committee:               Arent Fox, LLP
20                            555 West 5th Street
                              48th Floor
21                            Los Angeles, California 90013
                              (213) 629-7400
22

23

24
    Proceedings recorded by electronic sound recording;
25  transcript produced by transcription service.

*Briggs Reporting Company, Inc.*

ii

1 | APPEARANCES:  (cont'd.)

2 | For Hymanson, Incorporated:    ROBERT P. GOE, ESQ.
Goe, Forsythe & Hodges, LLP
3 | 18101 Von Karman Avenue
Suite 1200
4 | Irvine, California 92612
(949) 798-2460
5 |

6 | For Union Bank and            BRIAN T. HARVEY, ESQ.
John R. Baudhuin:          PHILIP A. GASTEIER, ESQ.
7 | Levene, Neale, Bender, Yoo &
Brill, LLP
8 | 10250 Constellation Boulevard
Suite 1700
9 | Los Angeles, California 90067
(310) 229-1234
10 |

11 | Court Recorder:               William Kaaumoana
United States Bankruptcy Court
12 | Edward R. Roybal Federal
Building
13 | 255 East Temple Street
Los Angeles, California 90012
14 |

15 | Transcriber:                  Briggs Reporting Company, Inc.
2160 Fletcher Parkway
16 | Suite 209
El Cajon, California 92020
17 | (310) 410-4151

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

*Briggs Reporting Company, Inc.*

1

1   LOS ANGELES, CALIFORNIA TUESDAY, NOVEMBER 26, 2019 10:00 AM

2                        --oOo--

3       (Call to order of the Court.)

4           THE COURT:  All right.  Let's do number one then,

5   Mad Dogg Athletics, Inc.

6           MS. TA:  Good morning, your Honor.  This is Cathy

7   Ta from Sulmeyer Kupetz, on behalf of the Debtor.

8           MR. HARVEY:  Good morning, your Honor.  Brian

9   Harvey on behalf of Union Bank.

10          Your Honor, I have a hearing right now before

11  Judge Russell.  I've requested second call.  So, with the

12  Court's indulgence, I'd like to just make a few quick

13  statements after everybody makes their appearance, and then

14  I've got to run over to Judge Russell's courtroom.

15          THE COURT:  All right.  I think that you are no

16  longer in the case, isn't that correct?

17          MR. HARVEY:  That's not actually correct.  We do

18  still have claims against the Debtor based on guarantees of

19  other loans, and that's what I wanted to explain.

20          THE COURT:  Okay.  All right.

21          MR. GASTEIER:  Good morning, your Honor.  Philip

22  Gasteier, Levene, Neale, Bender, Yoo and Brill, appearing on

23  behalf of John R. Baudhuin.

24          MR. KONG:  Your Honor, Andy Kong of Arent Fox for

25  the Committee.

*Briggs Reporting Company, Inc.*

2

1          MR. GOE:  Good morning, your Honor.  Robert Goe of

2    Goe, Forsythe and Hodges, for the Hymanson, Inc.

3          THE COURT:  All right.

4          All right.  Mr. Harvey, go ahead.

5          MR. HARVEY:  Thank you, your Honor.  So, as I

6    think you're aware, we completed our sale of the promissory

7    note and related loan agreements for the loan that was

8    provided directly from Union Bank to Mad Dogg, the Debtor.

9    But there are other real property loans to entities that are

10   also owned by Mr. Baudhuin.  There's five of them.  They're

11   secured by real property collateral, but Mad Dogg provides

12   guarantees of each of those five loans.

13          There is a very broad, general security agreement

14   that secures all of the obligations of Mad Dogg, including

15   the guarantee obligation of those five real property loans.

16          As far as we can tell, there is significant equity

17   securing each of those five loans.  And so we believe that

18   we're adequately protected, but we still hold an interest in

19   cash collateral based on the secured guarantee of those five

20   facilities.

21          So, I've reached an understanding with Debtor's

22   counsel that we consent to the use of cash collateral.  We

23   don't believe that we're entitled or need any adequate

24   protection payments, but we would like the same replacement

25   lien on the same priority that all of the creditors are

*Briggs Reporting Company, Inc.*

3

1 getting for use of cash collateral.

2        THE COURT:  I don't understand what your interest

3 is in Mad Dogg's cash collateral.

4        MR. HARVEY:  We have a guarantee of five

5 commercial real estate loans.  The guarantee was provided by

6 Mad Dogg, and that guarantee is secured by a security

7 agreement.  So, we have an interest in the accounts and --

8        THE COURT:  Which is a separate and distinct

9 security agreement from the, what was sold to Mr. Baudhuin

10 or the same one, so you both have an interest in that

11 security?

12        MR. HARVEY:  Yes.  There's a -- pursuant to the

13 sale of the note, there is an intercreditor agreement

14 arrangement between --

15        THE COURT:  All right.

16        MR. HARVEY:  -- us and Mr. Baudhuin sharing that

17 same security agreement.  And then an intercreditor

18 agreement arrangement for the distribution, if it ever

19 becomes necessary, of the liquidation proceeds, if that's

20 ever exercised under the security agreement.

21        Where the first dollars out from any liquidation

22 of the collateral would first be applied to the promissory

23 note on the Mad Dogg loan, and then after that is satisfied

24 in full, any remaining liquidation proceeds of the personal

25 property collateral of Mad Dogg would be applied to any

*Briggs Reporting Company, Inc.*

4

1  deficiency balances owed under the real property loans.

2      But we don't believe, at least as of now, that it

3  will ever get to that, because we're sufficiently secured by

4  the real property collateral.

5      THE COURT:  All right.  So you are consenting to

6  use of cash collateral?

7      MR. HARVEY:  That's correct.

8      THE COURT:  But you want a replacement lien, to

9  the extent of diminution in value of your collateral?

10     MR. HARVEY:  Yes.  Just what the current cash

11  collateral motion already proposes for the other secured

12  creditors, we're just looking for the same treatment.

13     THE COURT:  All right.  Including the other

14  provisions, like the no 506(c) surcharge and stuff like

15  that, because I have a real problem with those.

16     MR. HARVEY:  No.  No, your Honor.  So the cash

17  collateral motion generally just provides for -- there are

18  certain other secured creditors junior to the prior Union

19  Bank facility that have an interest in cash collateral.

20     That the motion proposes that those creditors

21  receive a replacement lien but are otherwise adequately

22  protected.  And we're consenting to use of cash collateral

23  on the same terms, which is that we believe we're adequately

24  protected as long as we're granted the same replacement lien

25  that's being granted to those other secured creditors.

*Briggs Reporting Company, Inc.*

EXHIBIT "1"

5

1          THE COURT:  Okay.  All right.

2          MR. HARVEY:  Thank you, your Honor.

3          THE COURT:  All right.  Thank you.

4          All right.  Ms. Ta, why should I do this?

5          MS. TA:  Your Honor, thank you for the Court's

6    tentative ruling.  And if I can just follow-up on the last

7    comments of Mr. Harvey there.

8          The motion states at page nine, lines five to

9    nine, with respect to junior secured creditors, proposal of

10   replacement liens, but only to the extent of their security

11   interests are valid, enforceable, properly perfected and

12   unavoidable, and the Debtor's use of cash collateral results

13   in diminution in the value of their cash collateral.

14         So I just want to put that out there, to make it

15   clear on the record that the Debtor is agreeable to

16   proposing the same type of replacement lien with respect to

17   Union Bank's security interest, however, because Union

18   Bank's guarantee claims to date have been filed within the

19   schedule that's unsecured claim, and they more recently

20   filed on November 8th a proof of claim, that's number 28,

21   asserting liens with respect to the guarantee claims.

22         We would like to make it clear within the proposed

23   order that the Debtor will propose this type of treatment,

24   but without conceding the validity of the filed proof of

25   claim or any of the asserted liens with respect to the

*Briggs Reporting Company, Inc.*

EXHIBIT "1"

6

1  guarantee claims.

2          THE COURT:  You reserve your rights?

3          MS. TA:  Yes, exactly.

4          THE COURT:  All right.

5          MS. TA:  Okay.  So, moving on, and if I may

6  structure it in this way, first to address the Court's

7  tentative ruling, then Hymanson, Incorporated's objection.

8          THE COURT:  Well, Hymanson and I have the similar

9  concerns.  So --

10          MS. TA:  Right.  And so, that discussion pretty

11  much in some ways overlaps.

12          So, I think what's most important for the Court to

13  know is that Mr. Baudhuin is represented by personal

14  counsel, who is sitting over there, Mr. Philip Gasteier.

15  And the bottom line is, the Debtor needs use of cash

16  collateral to operate.  And coming into this hearing today,

17  we had filed a motion for non-consensual use of cash

18  collateral, and are prepared to proceed on that motion.

19          And as noted in the motion at every single step of

20  the proposed operative period here, the Debtor filed

21  supplements to the extent that any stipulated use of cash

22  collateral were to be reached with its senior secured

23  creditor, let's define it now as to Union Bank line of

24  credit loan.

25          And in the past, the Debtor has been able to reach

*Briggs Reporting Company, Inc.*

7

1 that type of stipulated use with respect to Union Bank when

2 it was the holder.  And the third supplement was filed in

3 advance of today's hearing with respect to Mr. Baudhuin as

4 the new holder of that line of credit.

5         So, the way that the third supplement is set up,

6 is basically it provides for the same terms as what's

7 presented with respect to the Union Bank cash collateral

8 stipulations.  However, in discussing with Mr. Baudhuin's

9 personal counsel, and taking into account the Court's

10 tentative ruling, the -- Mr. Baudhuin has agreed to waive

11 the provisions, specifically, 1.1.3, 4.1 and 4.2, to address

12 the Court's concerns.

13         With respect to the provision at 5.1, Mr.

14 Baudhuin, through his personal counsel, has also agreed to

15 make conforming changes, so that particularly at 5.1,

16 subpart (ii), little two ii there, the granting in favor of

17 any party, and it goes to line nine, that shall also be

18 deleted.

19         And then with respect to 5.2.2, in terms of

20 consequences upon notice of default, that language is to be

21 modified so that it reads:

22             "Upon Debtor's failure to cure in

23             the event of default within five

24             calendar days after the delivery of the

25             notice of default, lender shall be

*Briggs Reporting Company, Inc.*

8

1           entitled to schedule a hearing on

2           shorten notice, and..."

3           And these are new words:

4           "...seek appropriate relief."

5           And the rest of that provision is deleted.

6           Like I said, Mr. Baudhuin's personal counsel is

7  here, and so I will have him address the Court's questions,

8  to the extent there are any further, further questions.

9           I think with respect to the default interest

10 payment that's being proposed, you know, since the Ninth

11 Circuit's New Investments case, which overturned Entz-White

12 in terms of construing 1123(d).

13          The perspective has been that default interest is

14 required to be paid.  And in order to cure the default,

15 which nobody disagrees does not exist, but with respect to

16 the overall approach here, we see that the stipulation in

17 its terms is more favorable than what used to be in terms of

18 the Union Bank's stipulation.

19          And with respect to Mr. Baudhuin's acquisition of

20 the Union Bank line of credit, the Debtor is advised and

21 anticipates that there are more options with respect to

22 treatment of that Union Bank line of credit claim with

23 respect to any proposed plan of reorganization.

24          As the Court is aware, Union Bank did not want to

25 be in the case with respect to maintaining its ownership of

EXHIBIT "1"

9

1 the Union Bank line of credit claim.  And, in general, these

2 are the terms that were agreed to with the current holder of

3 the Union Bank line of credit.

4          And so, like I said, the Debtor is ready to

5 proceed on the motion for non-consensual use, to the extent

6 that stipulated use is not approved by the Court.  And so I

7 will defer to Mr. Gasteier to address the Court's further

8 questions.

9          THE COURT:  All right.

10          MR. GASTEIER:  If I might, your Honor?  Thank you,

11 your Honor.

12          First, your Honor, I can confirm the new lender's

13 replacement lender's waiver deletion in effect from the

14 original stipulation of sections 1.1.3, which is the use of

15 cash collateral adverse lender actions' section.

16          4.1, which is waivers of alternative use, priming,

17 contest, and 4.2, which is the surcharge section, your

18 Honor.  These were all raised in your Honor' tentative.

19          And 5.1 was also raised in the tentative.  And we

20 looked at that, your Honor, and, again, we confirm the

21 waiver and deletion of clause two, which is a conforming

22 change to the deletion of 4.1.

23          And we believe the concern was not -- would not be

24 so much with having events of default, but with the

25 consequences of default.  And by radically altering the

*Briggs Reporting Company, Inc.*

10

1  consequences of default section 5.2.2, to only provide that

2  if there's an uncured default, the lender can -- will have

3  to seek a hearing on shortened notice, but the lender's

4  entitled to a hearing on shortened notice to seek

5  appropriate relief.

6          There's no longer any reference to a finding,

7  automatic finding of default.  There's no reference to

8  relief from stay.  It did say prior -- unless the Court

9  orders otherwise.

10         But now, it's just the lender, should the lender

11 choose to do that, can seek relief from this Court.  And we

12 believe that's appropriate.  We think it's a very favorable

13 change.  And we hope that resolves the concerns of the Court

14 and the parties.

15         We do recognize the Court's concerns, and waive

16 these provisions in the interest of moving forward.  Because

17 in our view, your Honor, this is a very positive -- the

18 acquisition of this loan is a very positive step toward

19 moving forward with a plan or reorganization, and really do

20 not want to create any impression that it's about anything

21 else.  So, that's why we readily agreed to revise the

22 stipulation.

23         I will say this about the holdover provisions

24 though, your Honor.  They were not included with the

25 intention of expanding Mr. Baudhuin's rights, or to create

11

1  any further appearance of conflict or potential for

2  conflict.

3         The process of taking out the Union Bank loan was

4  long and difficult.  It was completed very shortly before

5  the opposition, the deadline for opposition to cash

6  collateral.  And we wanted to move very quickly with counsel

7  for the Debtor, to be able to file something in advance of

8  that deadline, so parties could see it.  And we used the

9  prior format, so there would be no mystery and no surprises,

10  and no need to study it for two days to see what was going

11  on.

12         We incorporated what we thought were fairly

13  standard provisions from the stipulation with Union Bank

14  that had been approved by this Court several times

15  previously.  I -- and, again, your Honor, we were focused on

16  doing this as a positive step to take out Union Bank and

17  move forward with a plan of reorganization.  And I --

18         THE COURT:  Which is terrific, but then why

19  default interest?  We've heard from many people that's

20  there's concerns about this estate bleeding money.  The

21  Debtor, mister -- can you tell me how to say his name

22  properly?  Mister -- the principal, what is his name?

23         MR. GASTEIER:  I'm not sure I'm a expert in it yet

24  either, but --

25         THE COURT:  Who's going to tell me how to say it,

*Briggs Reporting Company, Inc.*

EXHIBIT "1"

12

1 Ms. Ta?

2          MR. GASTEIER:  -- Baudhuin.

3          THE COURT:  "Baudhuin."  Bodehuin?

4          MS. TA:  I've been saying Bodehuin.

5          THE COURT:  "Bodehuin."  Okay.  I hope I'm doing

6 that right, Mr. Baudhuin.  I don't want to mispronounce your

7 name.

8          He had to make a loan at the beginning of the case

9 because there wasn't enough money.  Mr. Goe's client has

10 been very concerned about the drain of money from the

11 professional fees in the case, which have been necessary.

12          And so now we've got a default interest provision

13 on a loan held by the principal.  And so now the principal

14 knows the Debtor, my gosh, I can't pay default interest, but

15 that's an event of default.  Now what?  Isn't that just an

16 irreconcilable conflict here?  I just, I -- my mind is

17 still trying -- I'm still trying to wrap my head around how

18 this -- there are not fiduciary issues here.

19          And I haven't heard a word from the creditors

20 committee, not one peep about this, so I don't even know

21 what they think.  I did -- Mr. Goe was able to dash off a

22 quick pleading on this, you know, after the notice that the,

23 you know, the transaction was completed, but -- and

24 creditors haven't had an opportunity to chime in on this.

25          It hasn't gone out on notice to the world with an

EXHIBIT "1"

13

1  opportunity to be heard on a loan now from the principal,

2  who's supposed to be acting in the interest, fiduciary

3  interest of the Debtor.  But he's got a loan and he wants to

4  collect default interest because it's allowed under Entz-

5  White according to Ms. Ta.

6          Whether something's allowed or not is -- you know,

7  doesn't make it not necessarily a conflict.  So, I'm not

8  sure.  I'll still trying to process this.

9          MR. GASTEIER:  I understand, your Honor.  And,

10 again, you know, we were focused on the positive, and I'd

11 like to go through that, and I'll address your Honor's

12 concerns.

13         But perhaps on these issues, what were sort of

14 standard -- our standard provisions, we didn't focus enough

15 on the concerns, and I apologize for that.  But, hopefully,

16 we've taken action to resolve those concerns.

17         The acquisition of the Union Bank loan is one of

18 the pieces in this case, and I recognize, your Honor, that,

19 you know, there are a number of pieces involving Mr.

20 Baudhuin, but this is the acquisition of an institutional

21 loan.  So this is a different matter -- forgive me, your

22 Honor.

23     (Pause.)

24         MR. GASTEIER:  This is a different matter from,

25 from the others.  But it does involve the principal of the

EXHIBIT "1"

14

1 Debtor.  We recognize that.

2         But there's a lot of benefits flowing to the

3 Debtor and to the progress of this case.  Union Bank

4 required the payment post-petition of $250,000.  That's half

5 of what the post-petition funding was.  That's gone.  That's

6 no longer going to be required.  And that's something that's

7 been accomplished to benefit the estate.

8         Also, the Debtor will not have to incur additional

9 attorney's fees dealing with Union Bank on the Union Bank

10 loan, or negotiating with Union Bank on a --

11         THE COURT:  No, because he could talk to himself.

12         MR. GASTEIER:  Excuse me?

13         THE COURT:  Because he could talk to himself.  So

14 -- because he's the Debtor and the lender.

15         MR. GASTEIER:  Well, we no longer have an

16 institutional lender, you know, in effect, billing the

17 estate and adding to a secured loan.  And, of course, Union

18 Bank's interest was in getting taken out of this case as

19 soon as possible.  It still is.

20         And by the way, your Honor, there -- Mr. Harvey

21 mentioned, you know, five guarantees.  One of those no

22 longer exists because the funds used to acquire this came

23 from a refinance of one of those Union Bank obligations,

24 taking it out.  So, another benefit is, it reduced the

25 contingent guaranteed claim of Union Bank.

*Briggs Reporting Company, Inc.*

15

1        But this Union Bank debt is now held by someone,

2   Mr. Baudhuin, who is interested in confirming the plan, not

3   just getting taken out of the case.  So, we really do view

4   it as a positive step.

5        The default interest.  I mentioned, your Honor,

6   that the funds used to acquire this loan came from a

7   refinance of one of the properties and -- so that did reduce

8   the bank's contingent claim by about $2.15 million.

9        However, your Honor, nothing comes for free.  And

10  the refinance came at a cost, and the monthly cost of

11  interest on the new loan is slightly more than the default

12  interest on the Union Bank loan.

13        The payment of default interest is consistent with

14  the motion and with prior orders.  In fact, because the

15  Union Bank loan has now been paid down to a principal amount

16  of 3.35, the interest payment will be less than it was

17  before.  It will be less than it was in the budget.  It is a

18  cash-flow issue to the lender.  And under the stipulation

19  we're talking about two months to a lender who's working to

20  reorganize the company.

21        We don't think it's out of line.  We think it's

22  consistent with the law.  We think it's less than was -- had

23  been done before.  And we think it's appropriate, your

24  Honor.

25        The -- let me make it clear this way.  Mr.

*Briggs Reporting Company, Inc.*

EXHIBIT "1"

16

1  Baudhuin is fully aware that in a plan of reorganization

2  administrative claims need to be paid.  And he's moving

3  forward with a plan of reorganization.  The company's moving

4  forward with a plan of reorganization.  And the -- allowing

5  him to maintain some minimal cash flow to assist in

6  maintaining his financial arrangements, so that he can

7  assist the Debtor in reorganizing.

8         I don't think that's a conflict.  I don't think

9  it's a large amount of money.  And as your Honor said, the

10 fact that the law may say something doesn't mean, you know,

11 it necessarily has to happen.

12        The fact that something is authorized doesn't mean

13 that the lender will actually exercise those rights.  So,

14 you know, I can't predict every penny of cash flow in

15 January standing here.

16        Businesses have ups and downs.  Cases have ups and

17 down.  But this is a relatively small authorization to a

18 lender who acquired the rights of a lender who was being

19 paid much more before.  It's a significant benefit to the

20 estate, the acquisition of this loan.

21        And it's a question of authorization of -- a bit

22 of balance to someone who is the moving force, not only in

23 this business, your Honor, but in moving this case forward

24 for the benefit of creditors with a plan of reorganization.

25        So, that's our view of the matter.  And I hate to

*Briggs Reporting Company, Inc.*

EXHIBIT "1"

1  see the tail wag the dog either way, but we think it's

2  appropriate.  This cash collateral stipulation, with the

3  waivers and alterations that we've now put on the record, is

4  what has been approved before, with a couple of significant,

5  with a couple of changes.

6          One is very significant, and that is that it

7  doesn't require a principal paydown to this secured lender

8  anymore.  That's a huge benefit to the estate.

9          And the other change in addition, again, to the,

10 what we put on the record, your Honor, is that we have

11 relief from stay, and that is -- I want to just explain so

12 there's no misunderstanding.

13         As you heard from counsel for Union Bank, they had

14 one security agreement it turns out.  And that means they

15 have one financing statement.  So, in acquiring the Union

16 Bank loan, we had to basically agree on a sharing

17 arrangement of rights, because Mr. Baudhuin is acquiring the

18 rights of Union Bank as to the Union Bank loan.

19         We had to agree on a sharing agreement.  That

20 involves us filing an amendment to the financing statement,

21 simply adding Mr. Baudhuin as an additional secured party.

22 I'm not sure even that adding an additional secured party

23 requires relief from stay, but, again, in the interest of

24 avoiding misunderstanding or any issue, the stipulation also

25 provides that relief from stay will be granted simply to

EXHIBIT "1"

18

1  make that filing adding him as an additional secured party.

2         With that, your Honor, we believe that given the

3  alterations agreed to on the record in the stipulation, that

4  the stipulation is appropriate.  We think that this is a

5  huge step forward in the reorganization of this case, which

6  is Mr. Baudhuin's focus.  And we urge the Court to approve

7  use of cash collateral with these understandings.  And we

8  urge all the other parties to join with us in moving this

9  case forward with a plan of reorganization.

10         Unless the Court has any other questions, I'll

11  yield at this time.

12         THE COURT:  Okay.  Thank you.  I'll hear from Mr.

13  Goe.

14         MR. GOE:  I don't even know where to start.  But

15  let's start with -- Mr. Harvey's still in the courtroom here

16  today.  What you heard is this, another breach of fiduciary

17  duty.  Mr. Baudhuin put up Mad Dogg to guarantee all of the

18  debt that he utilized to acquire his little empire of real

19  estate, which, of course, the Debtor is now paying rent

20  towards.

21         THE COURT:  Right, but that was prepetition.

22         MR. GOE:  "Prepetition."  I mean -- but, your

23  Honor, I've almost stopped even talking about the three,

24  $4,000,000 he looted prepetition, and the committee doesn't

25  care obviously, and you've already picked up on that.

*Briggs Reporting Company, Inc.*

19

1          The amount of money this gentleman took out of the

2    company prepetition, if it would be recovered, would be

3    sufficient to pay the unsecured creditors in full.  And

4    where are we at today?  Nothing has been done.  Zero.

5          THE COURT:  So, Mr. Goe, you could file a motion

6    -- if Mr. Kong isn't moving forward with what the committee

7    should do, you can file a motion, you know, or take 2004

8    exams, right, to get the financial documentation, because

9    it's the Debtor's position that that was loans and

10   repayments and things like that.

11         And, you know, I have -- I can't say because I

12   haven't really seen anything before me.  So, you could, you

13   know, if you want to, you could file a 2004 exam.  You know,

14   of course, you know that, so.

15         MR. GOE:  Right.  I don't even -- we don't even

16   need a 2004 exam.  We laid this up -- and I've filed these

17   pleadings many times earlier on, and, quite frankly, I just

18   stopped filing them.  They're in the record.

19         THE COURT:  Right.

20         MR. GOE:  But --

21         THE COURT:  But if, so if the creditors committee

22   won't pursue claims that you think exist, you could file a

23   motion to get permission to do that, right?

24         MR. GOE:  And maybe we'll have to do that.  You

25   know, then you've got the issue of the expense.  I mean,

*Briggs Reporting Company, Inc.*

EXHIBIT "1"

20

1  then we've got 503 issues --

2          THE COURT:  Right.  Well, yeah --

3          MR. GOE:  -- and substantial contribution.

4          THE COURT:  -- "substantial contribution."

5          MR. GOE:  Maybe what we just do is we just file it

6  and say that we want to have a substantial contribution

7  claim, you know, approved at this point in time.

8          Because my client's sitting here trying to protect

9  a $1,000,000 prepetition judgment he obtained, and, you

10 know, at some point in time the expense becomes, you know,

11 somewhat cost-prohibitive to continue to proceed --

12         THE COURT:  Right.

13         MR. GOE:  -- on account of things that I really

14 shouldn't have to be bringing up.

15         But for today, let's just talk about what we're

16 talking about with the cash collateral agreement.  Your

17 Honor's pointed out the inherent conflict that Mr. Baudhuin

18 continues to have.

19         I've never seen a case with somebody wearing so

20 many hats, prepetition lender, now he bought the bank debt

21 and he's a post-petition lender.  And he wants $400,000 in

22 salary, and he's the major supplier of goods, and he's the

23 landlord.  And then he filed, I don't know, four or

24 $5,000,000 of unsecured claims on top of that.  They act

25 like there's all these great intentions.  If Mr. Gasteier

*Briggs Reporting Company, Inc.*

21

1  today will say, you know what, Mr. Baudhuin's going to

2  propose a 100-percent pay plan, I probably would sit down

3  and wouldn't say a word.

4         But -- and I've said this before, mark my words,

5  he's locked this case up so tight he is going to come in and

6  say, boy, we're going to get the admins paid, and, sorry,

7  here's a few bucks for you unsecured creditors, but that's

8  all we've really got left, because everything's tied up by

9  my liens.  And that's where this case is going.  Mark my

10 words.  I said it a month ago, I said it two months ago, but

11 that's where we're going.

12        And the problem we have here is, and I'll -- I

13 make no bones about this.  The committee will do nothing to

14 get any sort of leverage in this case.  They won't do

15 anything to pursue Mr. Baudhuin, they won't do anything to

16 pursue a potential sale.

17        So we're stuck here today being completely

18 beholding to Mr. Baudhuin allegedly -- when he originally

19 said he was going to take out the bank, and now he says,

20 well, I'm going to buy the bank loan, such that there's

21 really no option.  He has -- he controls every card in this

22 case when eventually this plan gets proposed, that's going

23 to be significantly less than 100 cents on the dollar.

24 That's my prediction.

25        THE COURT:  Well, we do need a non-insider

*Briggs Reporting Company, Inc.*

EXHIBIT "1"

22

1  accepting impaired class, right?

2          MR. GOE:  Yeah.  I'm sure --

3          THE COURT:  So, I don't know, maybe there aren't

4  any.

5          MR. GOE:  There will be 50 grand of new value.

6  We'll see that one coming, too.

7          THE COURT:  Well, you'll --

8          MR. GOE:  That will be coming, too.

9          THE COURT:  There's ways for you to deal with

10 that.

11         MR. GOE:  Right.  So, let's talk about just the

12 cash collateral agreement today.

13         THE COURT:  Good idea.

14         MR. GOE:  He doesn't need a cash collateral

15 agreement.  He doesn't need a stipulation with the bells and

16 whistles of the bank.  He doesn't need any of that.  He can

17 consent to the use of cash collateral to allow his company

18 to continue to operate.

19         The idea that he's somehow making all these great

20 concessions and things is illusory, and I can point to a few

21 of the things, but I think the Court's already focused on

22 them.

23         He's got all -- and I'm not faulting Mr. Harvey

24 for putting the stipulation for the bank together like this,

25 but now when we're talking about Mr. Baudhuin it's a whole

*Briggs Reporting Company, Inc.*

23

1  different animal.

2          THE COURT:  Well, that's what I thought.  That's

3  why -- to go back through the docket and find that original

4  stipulation, and then read it last evening, and go, okay,

5  this might be a problem, that might be a problem.

6          MR. GOE:  We've got --

7          THE COURT:  And I -- that was just my quick review

8  of it.

9          MR. GOE:  Well, there's other issues, too.  If he

10 says there's a lack of adequate protection, he'll come in

11 and say, I've got a 507 superpriority administrative claim.

12         THE COURT:  Right.

13         MR. GOE:  All of the bells and whistles that a

14 third-party lender would ask for in a cash collateral

15 stipulation are built into this document.  So, it's just

16 land mines waiting to occur, that's going to happen when

17 they can't make the payments, or there's any other sort of

18 default under that agreement, such that your Honor would tie

19 everyone's hands by virtue of approving this.

20         And one of the most important things you have to

21 keep in mind, and this goes back -- and I attached the

22 transcript from the insider compensation hearing, and it's

23 still telling.  And all those same issues you posturing then

24 are here today.

25         At the end of January 2020, when this cash

*Briggs Reporting Company, Inc.*

24

1  collateral stipulation finishes, there will be a total of

2  $16,997 in the bank.  That's it.  So, for today's hearing,

3  your Honor, I think what should occur should be, he's

4  approving the use of cash collateral so his company can

5  operate, so it doesn't go under.  No default interest

6  payments, no payments at all.  He's going to let this

7  company continue to operate so that it doesn't go under, if

8  that's his hope to have this case reorganized.

9        And we can come back here in 30 days or so and

10 maybe revisit the issue.  But as you said before, I filed my

11 pleading with, you know, just a few hours of notice, after

12 seeing that he acquired this loan.  But there's absolutely

13 no basis to approve a stipulation with an insider with bells

14 and whistles, that can basically trigger huge defaults and

15 other ramifications and not -- we have -- none of us have

16 even explored at this point in time.

17       And, finally, things that haven't been disclosed

18 at all either are this intercreditor agreement he has with

19 the bank.  The fact that the bank's sharing in a single UCC-

20 1 with him, that there's a single security agreement, none

21 of this has been disclosed.  Nobody's had an opportunity to

22 evaluate this.

23       So, am I saying the company should be shut down

24 today?  No.  Should I say that he should get all kinds of

25 protections -- and you already gave him protections on

25

1  account of those post-petition loans that he made already.

2  So, he doesn't need any more protection.  He's got all the

3  protection he needs to keep his company alive.

4          Your Honor, I'd suggest that the Court approve the

5  use of cash collateral today, not approve the stipulation,

6  and let's come back after the first of the year, after

7  people have got a better opportunity to take a look at this.

8  All right.  Thank you, your Honor.

9          THE COURT:  Mr. Kong, does the committee have

10  anything to say?

11          MR. KONG:  Sure, your Honor.  Without waiving any

12  attorney-client privilege, at the end of the day we take our

13  direction from an informed committee.  We've had multiple

14  discussions with the Debtor with respect to cash collateral,

15  addressing even the Court's concerns as provided in the

16  tentative.

17          In terms of what's the bank focus for the

18  committee, it is a successful exit.  And you hear a lot from

19  Hymanson what that is going to look like, and what the

20  committee has not done.  But we can tell, and submit to your

21  Honor, that we've had an all-day meeting with the Debtor

22  regarding exit strategy, proposed plan terms.

23          Proposed plan terms were circulated to the

24  committee not too long ago, and that is actively being

25  discussed and negotiated.  So, that's our focus, your Honor.

26

1          THE COURT:  So you have no comments on cash

2 collateral or any concerns about --

3          MR. KONG:  I think Mr. Gasteier --

4          THE COURT:  -- fiduciary concerns?

5          MR. KONG:  -- and Mrs. Ta addressed most of the

6 Court's concerns.  And we --

7          THE COURT:  And the committee has none?

8          MR. KONG:  We have no opposition to it, your

9 Honor.

10         THE COURT:  All right.

11         Ms. Ta, it's your motion.

12         MS. TA:  All right.  Your Honor, you know, Mr. Goe

13 always does a very good job of bringing forth a lot of

14 different points, and a lot of them have been repeated

15 before the Court already at prior hearings.

16         And what I've done in each of those instances is

17 focus in on some of the primary things that he states to the

18 Court that I believe are deserving of a reply.

19         THE COURT:  Well, let's just talk about cash

20 collateral, because that's why we're here today.  We have

21 other people in the courtroom that we have to get to.

22         So let's just talk about his cash collateral

23 concerns, which are that the new lender should just consent

24 to use of cash collateral.  And his concern that at January,

25 end of January 2020, there's going to be $16,000 in the

EXHIBIT "1"

27

1    bank.

2            MS. TA:  Okay.  So, your Honor, let me take that

3    second item, which is that pursuant to the second cash

4    collateral budget, that is exactly what the cash flow

5    statement projects.  But I will, you know, indicate to the

6    Court, as is obvious to everybody else here, is that that's

7    a set of projections.

8            And if your Honor looks at the last monthly

9    operating report that was filed for end of October, the

10   ending cash position was about $95,000, with exceeds the

11   starting cash balance for the second cash collateral budget.

12           And so those are moving numbers.  And so to the

13   extent that the projections show that that's what they do

14   show as they are prepared, but with respect to the line item

15   that provides for default interest payment, and that budget,

16   if I may remind the Court, was prepared at a time when Union

17   Bank was still the holder of the Union Bank line of credit,

18   it provided for that.

19           And with respect to the actual motion before the

20   Court, and as I stated earlier today, the Debtor is prepared

21   to proceed on the motion for non-consensual use, but I will

22   probably indicate to the Court, because I think it's germane

23   here, within the motion, the proposed adequate protection

24   payment, as proposed at the time that it was filed, is

25   payment of default interest without any proposed payment of

*Briggs Reporting Company, Inc.*

EXHIBIT "1"

28

principal paydown.  Again, that was in the context of when

Union Bank was the holder of the secured claim here.

        Notwithstanding all of that, the point here today,

your Honor, is to allow the business to go forward with

respect to its operations.  And so, to the extent that your

Honor disapproves the stipulated terms as modified on the

record, and to the extent that the Court finds that the --

that there's a sufficient equity cushion as laid out in the

motion, provides adequate protection payment, then the

Debtor submits to whatever the Court believes would be

adequate protection payment as to all lenders.

        The point here is -- and I think this is, this is

what needs to be stressed, is that the Debtor is making

progress with respect a proposed plan of reorganization.

        And it's absolutely correct what Mr. Kong said,

which is that we met for one whole day with respect to an

exit strategy.  And we hope to get further feedback from the

committee.  And our intention also is to reach out to

Hymanson, Incorporated, with respect to those proposed

terms.

        With respect to the actual stipulated use of cash

collateral, to the extent that your Honor does find some

opening for that, all I can say as the company's counsel is

that those terms are more favorable than those previously

reached with Union Bank.  There's no required principal

*Briggs Reporting Company, Inc.*

EXHIBIT "1"

29

1  paydown.  The default interest is what it is based on a

2  lowered principal amount of about three-point-three-fifty-

3  million dollars.  And as to the excise provisions, I think

4  that's directly responsive to the Court's concerns.

5          THE COURT:  All right.  So, I can't read this very

6  well, but the -- this budget that you gave me does not

7  include principal for the Union Bank loan, right?

8          MS. TA:  Yes, your Honor.  That is correct.

9          THE COURT:  So the 16,000 at the end of January,

10 or 17,000 really, doesn't include that?

11         MS. TA:  It does not include that.

12         THE COURT:  I need new glasses.

13         MS. TA:  I'm sorry for the small font, your Honor.

14         THE COURT:  It's impossible --

15         MS. TA:  We tried to put 13 weeks there --

16         THE COURT:  -- it's impossible to read.

17         MS. TA:  -- and I apologize for that.

18         THE COURT:  It's impossible to read.  I can't read

19 what is the amount of the interest payment?

20         MS. TA:  So, I can read it out to you, your Honor.

21         THE COURT:  Yeah, you should, because I can't read

22 it.

23         MS. TA:  Yes.

24         THE COURT:  I think it says, 30,000 something --

25         MS. TA:  Yes.

30

1          THE COURT:  -- but I'm not sure.

2          MS. TA:  That's correct.  And that is, it's going

3  to be slightly lower because there's been an additional

4  principal paydown with respect to that second cash

5  collateral stipulation with Union Bank, since default

6  interest is calculated based on the principal.  So the

7  principal has been lowered by 50,000 since this was prepared

8  and filed with the Court.

9          THE COURT:  All right.

10          MS. TA:  If I may, your Honor.

11          THE COURT:  Uh-huh.

12          MS. TA:  And I know that this is not before the

13  Court, but I do want to just express to the Court that in

14  terms of some of the statements made, your Honor's

15  absolutely correct to point out that, to the extent that

16  Hymanson, Incorporated feels that there ought to be other

17  types of motion practice, then that is their prerogative.

18          I do want to state that Hartwood, Incorporated

19  (phonetic), which is what Mr. Goe was referring to as the

20  primary supplier, is actually one of among many.  And I

21  think what he's referring to is the fact these, the supplied

22  goods are of a, you know, significant amount, but that also

23  reflects the value of those supplied goods, which it to

24  supply the Debtor with the Wood Line equipment for his peak

25  pilates line, which is a substantial, you know, piece of

*Briggs Reporting Company, Inc.*

31

1  equipment for fitness.

2          With that, your Honor, I will -- to the extent

3  that Mr. Gasteier may have further comments, I yield the

4  lectern to him.

5          THE COURT:  All right.

6          Briefly, Mr. Gasteier.  We need to move on.

7          MR. GASTEIER:  Thank you, your Honor.  I need to

8  remind everyone that -- and have the Court consider that the

9  Debtor and Hymanson are in litigation.  That Hymanson is

10 also suing the Debtor and Mr. Baudhuin on another completely

11 disputed claim.  And that litigants sometimes make

12 assertions based on perceived strategic value, rather than a

13 rational and balanced assessment.

14          THE COURT:  Well, which is why I suggested to Mr.

15 Goe, and which I know he's familiar with all of these rules,

16 that if they think that the committee's not doing its job,

17 then they can file a motion to get permission to do that or

18 do further examination.

19          MR. GASTEIER:  And I very much appreciate that,

20 your Honor.  And I just don't want to leave a

21 misunderstanding that -- I mean, Hymanson did take a

22 judgment-debtor examination.  As you heard, they don't need

23 a 2004.  They have the information.  The information's been

24 out there.

25          The Debtor has supplied information to the

*Briggs Reporting Company, Inc.*

32

1  committee in response to that.  There's no mystery here.

2  Any issues will be worked out in the course of plan

3  negotiations.  There's not a big secret here.  There's not a

4  lack of information.  There's not people hiding things or

5  the committee ignoring its duties.  I don't want to leave

6  that misimpression, and I thank you for allowing me to try

7  to correct that.

8        I won't get into the details, but you also heard

9  that, you know, the arguments are based on supposition of

10 what's going to happen.  And that is not, that is not our

11 view.  It's not Mr. Baudhuin's view in acquiring this loan.

12       But, again, the Debtor's in litigation.  We have a

13 very hostile party.  The loan was acquired.  If he had paid

14 it, he'd be subrogated to the bank's rights in any event

15 under the bankruptcy code.  And there is, there's no

16 requirement that someone go into something completely

17 forfeiting any protections that they have.

18       What we have before the Court now is reasonable.

19 The authorization to pay a couple of months of interest on a

20 continuing basis from what's been done from the beginning of

21 the case is reasonable.

22       Mr. Baudhuin is looking to reorganize this

23 company, and to do it, if possible, consensually.  And he's

24 got to manage this business.  He wants to have a business

25 coming out of the other side.  So, he's got to look to what

*Briggs Reporting Company, Inc.*

33

1  the cash flow is.  The Debtor is in Chapter 11.  It's, of

2  course, on pay-up-front with -- terms with a lot of its

3  creditors.  It's not the best way to do business, but the

4  Debtor is pursuing it and getting through, and working to

5  propose a plan.

6        I think what we have before the Court in the

7  stipulation now is reasonable.  I hope we've addressed the

8  concerns of rights, which even authorized and with no

9  contemplation they might actually be exercised, could be.

10 We've tried to address those concerns.

11       We would ask the Court to approve use of cash

12 collateral with the stipulation as modified.  Thank you,

13 your Honor.

14       THE COURT:  All right.

15       All right.  So, I'm going to grant the Debtor's

16 non-consensual motion for use of cash collateral, and not

17 approve the stipulation today.  You can have an opportunity

18 to work out a stipulation that appropriately protects the

19 Debtor's future -- the Debtor and the fiduciary duties of

20 the principal, Ms. Ta, for future use of cash collateral.

21       But I'm going to -- the adequate protection I'm

22 going to order based on the motion.  The Debtor has --

23 there's an equity cushion for the Union Bank debt of 23-

24 percent.  That's enough.

25       So no interest payments, just a -- replacement

34

1  liens for all creditors, and we can revisit other issues at

2  the next hearing.

3          MS. TA:  And, your Honor, in terms of the next

4  hearing, because the current motion as filed goes through

5  the end of January 2020 --

6          THE COURT:  Uh-huh.

7          MS. TA:  -- we can certainly file a motion and set

8  it for hearing, but I think if we were to follow the prior

9  course of action within this case, we wonder if your Court,

10 your Honor would set a hearing date and some deadlines to

11 file a third motion.

12         THE COURT:  I think you could do it on regular

13 notice.  I have January 23rd is available.  It's a regular

14 Chapter 11 day on my calendar.

15         MS. TA:  All right, your Honor.

16         THE COURT:  So, you could just set it on regular

17 notice with regular response deadlines on that date.

18         MS. TA:  And, lastly, your Honor, just a matter of

19 housekeeping.  Our Chapter 11 plan filing deadline is coming

20 up on the 16th of December.  And last night we filed a

21 motion for extension of that filing deadline with an

22 application for order shortening time.  I have a copy here

23 should your Honor like that copy, but we've also left a

24 judge's copy in the appropriate place.

25         THE COURT:  You left it in the box?

EXHIBIT "1"

35

1          MS. TA:  Yes.

2          THE COURT:  Okay.  So that's fine.

3          MR. GOE:  Just for the record, we're not going to

4   oppose that --

5          THE COURT:  Right.

6          MR. GOE:  -- in case you were going to watch for

7   that, okay?

8          THE COURT:  Okay.

9          MS. TA:  Thank you.

10          THE COURT:  You're not opposing the ex-parte

11   application or the plan extension --

12          MR. GOE:  We're not opposing -- they're asking for

13   an extension to file the plan.

14          THE COURT:  Okay.

15          MR. GOE:  We're not going to be opposing that.

16          MS. TA:  Right.

17          THE COURT:  All right.

18          MS. TA:  And just so your Honor knows, and Mr.

19   Kong can confirm, the committee does not oppose the

20   application or the underlying motion.

21          THE COURT:  All right.

22          MR. KONG:  Confirm, your Honor.

23          THE COURT:  Okay.  All right, very good.

24          ALL PARTIES:  Thank you, your Honor.

25          THE COURT:  All right.  Thank you.

36

1          MR. GOE:  Can Ms. Ta run that order by me before

2 she submits it?

3          THE COURT:  Please, Ms. Ta.

4          MS. TA:  Yes, I will.

5          MR. GOE:  Thank you.

6       (Proceedings concluded.)

7

8

9          I certify that the foregoing is a correct

10 transcript from the electronic sound recording of the

11 proceedings in the above-entitled matter.

12

13 /s/ Holly Steinhauer          12-17-19
   Transcriber                    Date
14

15

16

17

18

19

20

21

22

23

24

25

*Briggs Reporting Company, Inc.*

EXHIBIT "1"

# EXHIBIT 2

# EXHIBIT 2

1        SUPERIOR COURT OF THE STATE OF CALIFORNIA

2      FOR THE COUNTY OF LOS ANGELES, CENTRAL DISTRICT

3

4  HYMANSON, INC., DBA BODY BLADE,)
                            )

5        Plaintiff,      )
                            )

6    vs.                )   CASE NO. BS167515
                            )

7  MAD DOGG ATHLETICS, INC.,   )
                            )

8        Defendant.      )
  _____)

9

10

11    JUDGMENT DEBTOR EXAMINATION OF JOHN BAUDHUIN

12          WEDNESDAY, JULY 3, 2019

13

14    APPEARANCES:

15    FOR PLAINTIFF:  ANDERSON, McPHARLIN & CONNERS LLP
                BY: KENNETH D. WATNICK, ESQ.

16                444 SOUTH FLOWER STREET, 31ST FLOOR
                LOS ANGELES, CALIFORNIA 90071

17

18

19

20

21  REPORTED BY:  KATHRYNNE CAMPOS-GIL, CSR 7779

22

23

24

25

                                          Page 1

1          Checks paid -- is that $20,003.50.  Is that

2     what you are talking about as child support?

3          A.  Where are you looking?

4          Q.  I'm looking in checks.

5          A.  No, that wouldn't be the correct amount.

6          Q.  Do you know what the amount is?

7          A.  It's --

8          Q.  I see 4/1.  I'm sorry.  On page 4 there are

9     electronic debits.  Do you know if it's wired or...

10         A.  Actually it would be wired.  Actually I think

11    I see it here.  It's the one that is 13,678.

12         Q.  So 13,678, that's the payment on behalf of you

13    that you then reimburse; correct?

14         A.  Correct.

15         Q.  Are there other payments made on behalf of you

16    other than this?

17         A.  No.  That would be, as far as I can recollect,

18    the only one that would be somewhat recurring, and,

19    again, more so from an administrative standpoint

20    because I travel.

21         Q.  But you are saying that we then should see a

22    corresponding reimbursement of that amount?

23         A.  No.  At any given time.  The company has owed

24    me far more than I've owed the company because of loans

25    I made to the company.  So it simply -- you know, the

                                        Page 31

1    timing of it is generally about the same or within

2    months of another.

3          Again, it's just -- yeah, it could be monthly.

4    It could be every three months.  But generally my loan

5    balance has exceeded -- the amounts I have lent the

6    company have exceeded the amounts that I have taken out

7    of the company.

8          The company -- so...

9    Q.  So in any of these bank statements are we

10   going to see payments from you?

11   A.  There probably are payments.  Again, I don't

12   recall specifically what dates and amounts those would

13   be.

14   Q.  Because you are talking about loans by you.

15   Did you personally make loans to the company?

16   A.  Not loans.  More so -- you know, if I were

17   to -- there are certain things like, for instance,

18   Keyman life insurance that is charged to my loan.  And

19   even though, you know, it's for the benefit of the

20   company in case if something happened to me, they are

21   not deductible by the company because if you deduct

22   them, the proceeds in the event of my death would

23   become taxable.

24         So, again, those are types of things that I

25   guess could be charged to my loan account which

                                            Page 32

# EXHIBIT 3

# EXHIBIT 3

Electronically FILED by Superior Court of California, County of Los Angeles on 04/05/2019 02:13 Sherri R. Carter, Executive Officer/Clerk of Court, by Monique Dillard, Deputy Clerk

**AT-138/EJ-125**

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY:       STATE BAR NO.: 150936<br>NAME: Kenneth D. Watnick<br>FIRM NAME: Anderson, McPharlin & Conners LLP<br>STREET ADDRESS: 707 Wilshire Boulevard, Suite 4000<br>CITY: Los Angeles      STATE: CA    ZIP CODE: 90017<br>TELEPHONE NO.: (213) 688-0080     FAX NO.: (213) 622-7594<br>E-MAIL ADDRESS: kdw@amclaw.com<br>ATTORNEY FOR (name): Judgment Creditor, Hymanson, Inc. dba Bodyblade | FOR COURT USE ONLY<br><br>**EXHIBIT**<br>/<br>Kathrynne Campos-Gil<br>CSR No. 7779 |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
STREET ADDRESS: 111 North Hill Street
MAILING ADDRESS:
CITY AND ZIP CODE: Los Angeles 90012
BRANCH NAME: Central

PLAINTIFF HYMANSON, INC. dba BODYBLADE
DEFENDANT MAD DOGG ATHLETICS, INC.

| APPLICATION AND ORDER FOR APPEARANCE AND EXAMINATION | CASE NUMBER: |
|---|---|
| ☒   ENFORCEMENT OF JUDGMENT    ☐   ATTACHMENT (Third Person)<br>     ☐   Judgment Debtor      ☐   Third Person | BS167515 |

### ORDER TO APPEAR FOR EXAMINATION

1. TO (name): John R. Baudhuin on behalf of MAD DOGG ATHLETICS, INC.
2. YOU ARE ORDERED TO APPEAR personally before this court, or before a referee appointed by the court, to
   a. ☒   furnish information to aid in enforcement of a money judgment against you.
   b. ☐   answer concerning property of the judgment debtor in your possession or control or concerning a debt you owe the judgment debtor.
   c. ☐   answer concerning property of the defendant in your possession or control or concerning a debt you owe the defendant that is subject to attachment.

| | |
|---|---|
| Date: July 3, 2019     Time: 8:30 a.m.     Dept. or Div.: 44     Rm.: | |
| Address of court ☒ is shown above ☒   is: | |

3. This order may be served by a sheriff, marshal, registered process server, **or** the following specially appointed person (name):

Date:   04/05/19

                           Edward B. Moreton, Jr.
                                           JUDGE

| This order must be served not less than 10 days before the date set for the examination. |
|---|
| **IMPORTANT NOTICES ON REVERSE** |

### APPLICATION FOR ORDER TO APPEAR FOR EXAMINATION

4. ☒   Original judgment creditor    ☐   Assignee of record    ☐   Plaintiff who has a right to attach order applies for an order requiring (name): John R. Baudhuin on behalf of MAD DOGG ATHLETICS, INC. to appear and furnish information to aid in enforcement of the money judgment or to answer concerning property or debt.
5. The person to be examined is
   a. ☒   the judgment debtor.
   b. ☐   a third person (1) who has possession or control of property belonging to the judgment debtor or the defendant or (2) who owes the judgment debtor or the defendant more than $250. An affidavit supporting this application under Code of Civil Procedure section 491.110 or 708.120 is attached.
6. The person to be examined resides or has a place of business in this county or within 150 miles of the place of examination.
7. ☐   This court is **not** the court in which the money judgment is entered or (attachment only) the court that issued the writ of attachment. An affidavit supporting an application under Code of Civil Procedure section 491.150 or 708.160 is attached.
8. ☐   The judgment debtor has been examined within the past 120 days. An affidavit showing good cause for another examination is attached.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: April 5, 2019

Kenneth D. Watnick
(TYPE OR PRINT NAME)                                   (SIGNATURE OF DECLARANT)

                           (Continued on reverse)

Form Adopted for Mandatory Use<br>Judicial Council of California<br>AT-138/EJ-125 [Rev. January 1, 2017]

**APPLICATION AND ORDER FOR**
**APPEARANCE AND EXAMINATION**
(Attachment—Enforcement of Judgment)

Page 1 of 2<br>Code of Civil Procedure,<br>§§ 491.110, 708.110, 708.120, 708.170<br>www.courts.ca.gov


American LegalNet, Inc.
www.FormsWorkFlow.com

Electronically Received 04/05/2019 02:13 PM

EXHIBIT "3"

AT-138/EJ-125

**Information for Judgment Creditor Regarding Service**
If you want to be able to ask the court to enforce the order on the judgment debtor or any third party, you must have a copy of the order personally served on the judgment debtor by a sheriff, marshal, registered process server, or the person appointed in item 3 of the order at least 10 calendar days before the date of the hearing, and have a proof of service filed with the court.

### IMPORTANT NOTICES ABOUT THE ORDER

**APPEARANCE OF JUDGMENT DEBTOR (ENFORCEMENT OF JUDGMENT)**
**NOTICE TO JUDGMENT DEBTOR**  If you fail to appear at the time and place specified in this order, you may be subject to arrest and punishment for contempt of court, and the court may make an order requiring you to pay the reasonable attorney fees incurred by the judgment creditor in this proceeding.

**APPEARANCE OF A THIRD PERSON (ENFORCEMENT OF JUDGMENT)**
**(1) NOTICE TO PERSON SERVED**  If you fail to appear at the time and place specified in this order, you may be subject to arrest and punishment for contempt of court, and the court may make an order requiring you to pay the reasonable attorney fees incurred by the judgment creditor in this proceeding.

**(2) NOTICE TO JUDGMENT DEBTOR**  The person in whose favor the judgment was entered in this action claims that the person to be examined under this order has possession or control of property that is yours or owes you a debt. This property or debt is as follows *(describe the property or debt)*:

If you claim that all or any portion of this property or debt is exempt from enforcement of the money judgment, you must file your exemption claim in writing with the court and have a copy personally served on the judgment creditor not later than three days before the date set for the examination. You must appear at the time and place set for the examination to establish your claim of exemption or your exemption may be waived.

**APPEARANCE OF A THIRD PERSON (ATTACHMENT)**
**NOTICE TO PERSON SERVED**  If you fail to appear at the time and place specified in this order, you may be subject to arrest and punishment for contempt of court, and the court may make an order requiring you to pay the reasonable attorney fees incurred by the plaintiff in this proceeding.

**APPEARANCE OF A CORPORATION, PARTNERSHIP,
ASSOCIATION, TRUST, OR OTHER ORGANIZATION**
It is your duty to designate one or more of the following to appear and be examined: officers, directors, managing agents, or other persons who are familiar with your property and debts.

 **Request for Accommodations.** Assistive listening systems, computer-assisted real-time captioning, or sign language interpreter services are available if you ask at least 5 days before your hearing. Contact the clerk's office for *Request for Accommodation* (form MC-410). (Civil Code, § 54.8.)

AT-138/EJ-125 [Rev. January 1, 2017]
**APPLICATION AND ORDER FOR
APPEARANCE AND EXAMINATION
(Attachment—Enforcement of Judgment)**
Page 2 of 2



SUBP-002

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| Kenneth D. Watnick - Bar No. 150936<br>Anderson, McPharlin & Conners LLP<br>707 Wilshire Boulevard, Suite 4000<br>Los Angeles, CA 90017 | |

TELEPHONE NO.: (213) 688-0080    FAX NO.: (213) 622-7594
E-MAIL ADDRESS: kdw@amclaw.com
ATTORNEY FOR *(Name)*: Plaintiff HYMANSON, INC. dba BODYBLADE

NAME OF COURT: Superior Court of California
STREET ADDRESS: 111 North Hill Street
MAILING ADDRESS:
CITY AND ZIP CODE: Los Angeles 90012
BRANCH NAME: Central Division, Stanley Mosk Courthouse

PLAINTIFF/ PETITIONER: HYMANSON, INC. dba BODYBLADE

DEFENDANT/ RESPONDENT: MAD DOGG ATHLETICS, INC.

| **CIVIL SUBPOENA (DUCES TECUM) for Personal Appearance and Production of Documents, Electronically Stored Information, and Things at Trial or Hearing and DECLARATION** | CASE NUMBER:<br>BS167515 |
|---|---|

THE PEOPLE OF THE STATE OF CALIFORNIA, TO *(name, address, and telephone number of witness, if known)*:
John R. Baudhuin on behalf of Mad Dogg Athletics, Inc., 2111 Narcissus Court, Venice, CA 90291

1.  **YOU ARE ORDERED TO APPEAR AS A WITNESS** in this action at the date, time, and place shown in the box below
    UNLESS your appearance is excused as indicated in box 3b below or you make an agreement with the person named in
    item 4 below.

    a. Date: July 3, 2019          Time: 8:30 a.m.          ☒ Dept.: 44          ☐ Div.:          ☐ Room:
    b. Address: 111 North Hill Street, Los Angeles, CA 90012

2.  **IF YOU HAVE BEEN SERVED WITH THIS SUBPOENA AS A CUSTODIAN OF CONSUMER OR EMPLOYEE RECORDS
    UNDER CODE OF CIVIL PROCEDURE SECTION 1985.3 OR 1985.6 AND A MOTION TO QUASH OR AN OBJECTION HAS
    BEEN SERVED ON YOU, A COURT ORDER OR AGREEMENT OF THE PARTIES, WITNESSES, *AND* CONSUMER OR
    EMPLOYEE AFFECTED MUST BE OBTAINED BEFORE YOU ARE REQUIRED TO PRODUCE CONSUMER OR EMPLOYEE
    RECORDS.**

3.  **YOU ARE** *(item a or b must be checked)*:
    a. ☒ Ordered to appear in person and to produce the records described in the declaration on page two or the attached
        declaration or affidavit. The personal attendance of the custodian or other qualified witness and the production of the
        original records are required by this subpoena. The procedure authorized by Evidence Code sections 1560(b), 1561, and
        1562 will not be deemed sufficient compliance with this subpoena.
    b. ☐ Not required to appear in person if you produce (i) the records described in the declaration on page two or the attached
        declaration or affidavit and (ii) a completed declaration of custodian of records in compliance with Evidence Code sections
        1560, 1561, 1562, and 1271. (1) Place a copy of the records in an envelope (or other wrapper). Enclose the original
        declaration of the custodian with the records. Seal the envelope. (2) Attach a copy of this subpoena to the envelope or
        write on the envelope the case name and number; your name; and the date, time, and place from item 1 in the box above.
        (3) Place this first envelope in an outer envelope, seal it, and mail it to the clerk of the court at the address in item 1.
        (4) Mail a copy of your declaration to the attorney or party listed at the top of this form.

4.  **IF YOU HAVE ANY QUESTIONS ABOUT THE TIME OR DATE YOU ARE TO APPEAR, OR IF YOU WANT TO BE CERTAIN
    THAT YOUR PRESENCE IS REQUIRED, CONTACT THE FOLLOWING PERSON BEFORE THE DATE ON WHICH YOU ARE
    TO APPEAR:**

    a. Name of subpoenaing party or attorney: Kenneth D. Watnick          b. Telephone number: (213) 236-1627

5.  **Witness Fees:** You are entitled to witness fees and mileage actually traveled both ways, as provided by law, if you request them
    at the time of service. You may request them before your scheduled appearance from the person named in item 4.

**DISOBEDIENCE OF THIS SUBPOENA MAY BE PUNISHED AS CONTEMPT BY THIS COURT. YOU WILL ALSO BE LIABLE
FOR THE SUM OF FIVE HUNDRED DOLLARS AND ALL DAMAGES RESULTING FROM YOUR FAILURE TO OBEY.**

Date issued: June 3, 2019

Kenneth D. Watnick
_____
(TYPE OR PRINT NAME)

▶ _____
(SIGNATURE OF PERSON ISSUING SUBPOENA)

Attorney
_____
(TITLE)

*(Declaration in support of subpoena on reverse)*          Page 1 of 3

Form Adopted for Mandatory Use
Judicial Council of California
SUBP-002 [Rev. January 1, 2012]

**CIVIL SUBPOENA (DUCES TECUM) for Personal Appearance and
Production of Documents, Electronically Stored Information, and Things at
Trial or Hearing and DECLARATION**

Code of Civil Procedure,
§1985 et seq
www.courts.ca.gov

EXHIBIT "3"

SUBP-002

| | |
|---|---|
| PLAINTIFF/PETITIONER: HYMANSON, INC. dba BODYBLADE | CASE NUMBER: |
| DEFENDANT/RESPONDENT: MAD DOGG ATHLETICS, INC. | BS167515 |

The production of the documents, electronically stored information, or other things sought by the subpoena on page one is supported by (check one):

☐ the attached affidavit or          ☒ the following declaration:

**DECLARATION IN SUPPORT OF CIVIL SUBPOENA (DUCES TECUM) FOR PERSONAL APPEARANCE AND PRODUCTION OF DOCUMENTS, ELECTRONICALLY STORED INFORMATION, AND THINGS AT TRIAL OR HEARING (Code Civ. Proc., §§ 1985, 1987.5)**

1. I, the undersigned, declare I am the ☐ plaintiff    ☐ defendant    ☐ petitioner    ☐ respondent
   ☒ attorney for (specify): Plaintiff    ☐ other (specify):
   in the above-entitled action.

2. The witness has possession or control of the documents, electronically stored information, or other things listed below, and shall produce them at the time and place specified in the Civil Subpoena for Personal Appearance and Production of Records at Trial or Hearing on page one of this form (specify the exact documents or other things to be produce; if electronically stored information is demanded, the form or forms in which each type of information is to be produced may be specified):
   See Attachment 2.

   ☐ Continued on Attachment 2.

3. Good cause exists for the production of the documents, electronically stored information, or other things described in paragraph 2 for the following reasons:
   The items set forth herein and the information which they contain will be used as an aid and are necessary to expeditiously complete the examination of an officer of the judgment debtor, Mad Dogg Athletics, Inc., regarding said judgment debtor's property subject to levy.  This information and documentation are not otherwise available to the judgment creditor.

   ☐ Continued on Attachment 3.

4. The documents, electronically stored information, or other things described in paragraph 2 are material to the issues involved in this case for the following reasons:
   It is necessary that the information and the documentation set forth herein be produced so that the judge or referee can ascertain the scope of the judgment debtor's property subject to execution to be applied toward the satisfaction of the judgment.

   ☐ Continued on Attachment 4.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: June 3, 2019

Kenneth D. Watnick
_____                    ▶ _____
        (TYPE OR PRINT NAME)                          (SIGNATURE OF ☐ SUBPOENAING PARTY    ☒ ATTORNEY FOR
                                                                                            SUBPOENAING PARTY)

| |
|---|
| **Request for Accommodations** |
| Assistive listening systems, computer-assisted real-time captioning, or sign language interpreter services are available if you ask at least five days before the date on which you are to appear. Contact the clerk's office or go to www.courts.ca.gov/forms for Request for Accommodations by Persons With Disabilities and Response (form MC-410). (Civil Code, § 54.8.) |

SUBP-002 [Rev. January 1, 2012]    **CIVIL SUBPOENA (DUCES TECUM) for Personal Appearance and    Page 2 of 3**
**Production of Documents, Electronically Stored Information, and Things at
Trial or Hearing and DECLARATION**

American LegalNet, Inc.
www.FormsWorkFlow.com

EXHIBIT "3"

SUBP-002

| | |
|---|---|
| PLAINTIFF/PETITIONER: HYMANSON, INC. dba BODYBLADE | CASE NUMBER: |
| DEFENDANT/RESPONDENT: MAD DOGG ATHLETICS, INC. | |

**PROOF OF SERVICE OF CIVIL SUBPOENA (DUCES TECUM) for Personal Appearance and Production of Documents, Electronically Stored Information, and Things at Trial or Hearing and DECLARATION**

1. I served this *Civil Subpoena (Duces Tecum) for Personal Appearance and Production of Documents, Electronically Stored Information, and Things at Trial or Hearing and Declaration* by personally delivering a copy to the person served as follows:

   a. Person served *(name)*:

   b. Address where served:

   c. Date of delivery:

   d. Time of delivery:

   e. Witness fees *(check one)*:
      (1) ☐ were offered or demanded
          and paid. Amount:...............$ _____
      (2) ☐ were not demanded or paid.

   f. Fee for service: ................................$ _____

2. I received this *subpoena* for service on *(date)*:

3. Person serving:
   a. ☐ Not a registered California process server.
   b. ☐ California sheriff or marshal.
   c. ☐ Registered California process server.
   d. ☐ Employee or independent contractor of a registered California process server.
   e. ☐ Exempt from registration under Business and Professions Code section 22350(b).
   f. ☐ Registered professional photocopier.
   g. ☐ Exempt from registration under Business and Professions Code section 22451.
   h. Name, address, telephone number, and, if applicable, county of registration and number:

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:

▶ _____
          (SIGNATURE)

**(For California sheriff or marshal use only)**
I certify that the foregoing is true and correct.

Date:

▶ _____
          (SIGNATURE)

SUBP-002 [Rev. January 1, 2012]

**CIVIL SUBPOENA (DUCES TECUM) for Personal Appearance and
Production of Documents, Electronically Stored Information, and Things at
Trial or Hearing and DECLARATION**

Page 3 of 3

American LegalNet, Inc.
www.FormsWorkFlow.com

EXHIBIT "3"

## ATTACHMENT 2

## DEFINITIONS

1.     As used herein, the term "YOU" or "YOUR" shall mean John Baudhuin on behalf of Mad Dogg Athletics, Inc., YOUR officers, members, agents, employees, representatives, successors and assigns, and any other person or entity acting on YOUR behalf.

2.     As used herein, "DOCUMENT" or "DOCUMENTS" shall mean any and all writings as defined by Evidence Code section 250 and electronically stored information ("ESI") as defined by Code of Civil Procedure section 2016.020, and includes, without limitation, any computer disk, diskette, tape, card, ESI, or other folin of computer data storage, any writing or graphic matter, however produced or reproduced, of any kind or description, whether sent or received, including original copies, drafts, and both sides thereof, memoranda, letters, pocket or other calendars, diaries, evaluations, files, microfilms, notations, notes, papers, photographs, sound recordings, summaries, telegrams, telephone logs, telephone messages, telexes, time cards, work papers, and all other records kept by electronic, photographic, magnetic, or other means, regardless of their author or origin, or however denominated by YOU.

3.     As used in this Subpoena, every non-identical copy (i.e., any DOCUMENT which initially was identical in all respects to another DOCUMENT but which is no longer identical by virtue of any notation or modification of any kind, including, without limiting the generality of the foregoing, notes or modifications on the backs or margins of pages thereof or on copies thereof or by virtue of attachments thereto) of a DOCUMENT is a separate DOCUMENT and must be produced in response to this Subpoena.

4.     All designated DOCUMENTS are to be produced, including all attachments and enclosures.

1

## INSTRUCTIONS

Plaintiff and Judgment Creditor, Hymanson, Inc. dba Bodyblade, requests the following DOCUMENTS be produced at YOUR examination, in YOUR control and/or in the control of YOUR agents, attorneys, shareholders, successors, officers and or assigns as well as any third parties. Copies, unless originals are specifically requested, of any and all DOCUMENTS evidencing the existence of any assets to which YOU claim a legal or beneficial interest in, including but not limited to the items specified below.

If any of the DOCUMENTS are too bulky or voluminous to be produced at said time and place of the Judgment Debtor Examination, please notify Kenneth D. Watnick, at least ten days before that time, and identify said DOCUMENTS with specificity. For good cause shown and at the discretion of Kenneth D. Watnick, as legal counsel for Plaintiff and Judgment Creditor, special arrangements may be made for the inspection and copying of said DOCUMENTS.

Please be sure to identify by category each DOCUMENT in YOUR possession or subject to your control which falls into said category.

YOU have been ordered to produce the DOCUMENTS. If you are unwilling to produce any particular DOCUMENT, please identify said DOCUMENT with specificity and state the reason and/or objection as to each DOCUMENT you refuse to produce pursuant to this Subpoena. Please consult with your legal counsel as to the requirements under the statute with respect to the production of DOCUMENTS requested and the potential of being held in contempt of court for your failure to comply.

2

EXHIBIT "3"

## DOCUMENTS TO BE PRODUCED

1. Copies of any and all bank, credit union and financial investment records, including, but not limited to, statements, check registers, checks and deposit slips and items deposited, for the past twelve months to the present, including, but not limited to, all statements from any checking account, savings account, money market, certificate of deposit, IRA, pension fund, brokerage account, or any other type of account at any financial institution and credit union where said account is held in **YOUR** name, including, but not limited to, Union Bank.

2. Copies of any and all bank, credit union and financial investment records, including, but not limited to, copies of check registers for each account, all account statements for each account evidencing the deposits made and checks written, copies of checks from and deposits made into each of the accounts **YOU** have maintained for the past twelve months to the present.

3. Copies of any and all bank records relating to any and all safe deposit boxes in **YOUR** name alone or with any other third-party safe deposit boxholder(s). This includes producing an inventory list of the contents in the safe deposit boxes, as well as the name(s) and address(es) of any third-party safe deposit boxholder(s).

4. Copies of all financial statements either prepared by or for **YOU** for the past five years to the present.

5. Original registrations, lease agreements, loan documents and/or pink slips for any automobiles or other motor vehicles which are listed in **YOUR** name which **YOU** may have any interest in, whether as legal owner, registered owner or as lessee.

6. Copies of all documents evidencing **YOUR** federal tax identification number.

7. Any and all original contracts, writings, records and/or original documents which evidence any monies owed to **YOU** by any third party, including but not limited to, Costco, Amazon, Walmart, or Precor, Inc. If original notes, records and/or original documents are not available, then copies of said documents.

8. Copies of any and all deeds, including all transfer deeds, grant deeds, quitclaim deeds and deeds of trust to any real property in which **YOU** currently hold, either directly or indirectly, or in which **YOU** previously held an ownership interest.

9. Copies of appraisals for personal property consisting of inventory and equipment in which **YOU** own, which is valued in excess of $500.00.

10. Copies of **YOUR** insurance policies, including, but not limited to, any endorsements or riders attached thereto for any of **YOUR** business assets.

11. Produce an itemization of all **YOUR** inventory, machinery and equipment now in **YOUR** possession or in the possession or control of any third party.

EXHIBIT "3"

12. A written itemized list of all current debts or judgments in excess of $5,000 which **YOU** owe, indicating the amount owed, to whom and the date incurred.

13. An itemized list of **YOUR** monthly expenses, itemizing by name of creditors and monthly amount for the past twelve months to the present.

14. An itemized list of **YOUR** monthly income and revenue, itemizing by source and amount for the past twelve months to the present.

15. Copies of any and all statements of income, including, but not limited to W-2's, 1099's, K-1's, or otherwise evidencing **YOUR** income for the past twelve months to the present.

16. Copies of **YOUR** accounts receivable ledgers for the past five years to the present.

17. Copies of **YOUR** accounts payable ledgers for the past five years to the present

18. The present name, address and phone number of **YOUR** tax preparer for the past five years to the present.

19. Copies of any and all notices of tax liens and any notices of release thereof, whether federal, state, or California Franchise Tax Board, for the past five years to the present.

20. Copies of any judgments against **YOU,** whether a state court judgment or federal court judgment.

21. With respect to any civil action filed within the past five years that is still pending in which **YOU** are a named party, whether state court or federal court, provide copies of the filed Complaint.

22. Copies of any bills of sale or other documentation evidencing a transfer, sale, lease, loan, hypothecation or encumbrance of any item of real or personal property in which YOU have an interest and transferred said interest, in whole or in part, to a third party or parties, for the past five years to the present. Also indicate the name and address of the third party(ies) as well as a complete description of the item of real property or personal property transferred and the amount received if over $5,000.

23. Copies of YOUR executed State and Federal Tax Returns and K-1's for the past five years.

24. Copies of YOUR articles of incorporation, bylaws and statements of domestic stock corporation filed with the Secretary of State since YOUR inception.

25. Copies of YOUR stock register for the past five years to the present.

26. Any license or distribution agreement between YOU and any third party, including, but not limited to, Precor, Inc.

4

27.     Any DOCUMENTS that reflect debts, loans, or transfers by YOU to John Baudhuin;
        Phoenix to LA, LLC; Syrac LLC; or any other entity owned or controlled by John
        Baudhuin.

28.     Any DOCUMENTS that reflect payments or transfers to YOU from John Baudhuin;
        Phoenix to LA, LLC; Syrac LLC; or any other entity owned or controlled by John
        Baudhuin.

29.     All dealer agreements for YOUR dealers or distributors.

30.     All DOCUMENTS that reflect debts, loans, or transfers by YOU to Peak Pilates,
        CrossCore, Ugi, and/or Resist-A-Ball.

31.     All DOCUMENTS that reflect debts, loans, or transfers owed to YOU by Peak Pilates,
        CrossCore, Ugi, and/or Resist-A-Ball.

5

# EXHIBIT 4

# EXHIBIT 4

MAD DOGG ATHLETICS, INC.

**FINANCIAL STATEMENTS**

Year Ended December 31, 2018



EXHIBIT "4"

**MHM**

10474 Santa Monica Blvd., Suite 200 ■ Los Angeles, CA 90025
Main: 310.268.2000 ■ Fax: 310.268.2001 ■ www.mhmcpa.com

## INDEPENDENT ACCOUNTANTS' REVIEW REPORT

To the Stockholder
**MAD DOGG ATHLETICS, INC.**

We have reviewed the accompanying financial statements of Mad Dogg Athletics, Inc. (the "Company"), which comprise the balance sheet as of December 31, 2018 and the related statements of operations, changes in stockholder's equity, and cash flows for the year then ended, and the related notes to the financial statements. A review includes primarily applying analytical procedures to management's financial data and making inquiries of company management. A review is substantially less in scope than an audit, the objective of which is the expression of an opinion regarding the financial statements as a whole. Accordingly, we do not express such an opinion.

**Management's Responsibility for the Financial Statements**

Management is responsible for the preparation and fair presentation of these financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement whether due to fraud or error.

**Accountants' Responsibility**

Our responsibility is to conduct the review engagement in accordance with Statements on Standards for Accounting and Review Services promulgated by the Accounting and Review Services Committee of the American Institute of Certified Public Accountants ("AICPA"). Those standards require us to perform procedures to obtain limited assurance as a basis for reporting whether we are aware of any material modifications that should be made to the financial statements for them to be in accordance with accounting principles generally accepted in the United States of America. We believe that the results of our procedures provide a reasonable basis for our conclusion.

**Accountants' Conclusion**

Based on our review, except for the issue noted in the Known Departure from Accounting Principles Generally Accepted in the United States of America paragraph, we are not aware of any material modifications that should be made to the accompanying financial statements in order for them to be in accordance with accounting principles generally accepted in the United States of America.

**KRESTON** Member of Kreston International — a global network of independent accounting firms

EXHIBIT "4"

**Known Departures from Accounting Principles Generally Accepted in the United States of America**

As disclosed in Notes 3, 5 and 6 to the financial statements, accounting principles generally accepted in the United States of America require an acquirer in a business combination to recognize the assets acquired and liabilities assumed measured at their acquisition date fair values, and to recognize goodwill as the excess of the consideration transferred over the fair value of the identifiable net assets acquired. Consideration transferred from the acquirer should also be recognized at acquisition date fair values. Goodwill is not to be amortized but is to be tested annually for impairment. Intangible assets acquired with finite useful lives are to be amortized over the periods the assets are expected to contribute to the future cash flows of the entity. Management has informed us that the Company has recognized the assets and liabilities acquired and the consideration transferred based on its estimate of fair value, and recognized cost exceeding the net amounts of these estimated fair values as goodwill, which was not determined in accordance with accounting principles generally accepted in the United States of America. Further, goodwill and intangible assets acquired are being amortized over 15 years, representing the amortization period allowed for income tax purposes.

In addition, as disclosed in Note 15 to the financial statements, accounting principles generally accepted in the United States of America related to defined benefit pension plans require the full funding status of the plan to be recognized on the balance sheet as an asset for overfunded plans or as a liability for underfunded plans as well as specific disclosures regarding the plan. The funded status of the plan and accumulated other comprehensive income has not been determined and the required disclosures have not been made.

Management has not determined the effects of these departures from accounting principles generally accepted in the United States of America on the accompanying financial statements.

**Limitations of the Financial Statements**

Because the significance and pervasiveness of the matters described in the Known Departures from Accounting Principles Generally Accepted in the United States of America paragraph make it difficult to assess their effects on the financial statements, users of the accompanying financial statements should recognize that they might reach different conclusions about the Company's financial position, results of operations, and cash flows if they had access to revised financial statements prepared in accordance with accounting principles generally accepted in the United States of America.

**Emphasis of Matter with Respect to a Going Concern Uncertainty**

The accompanying financial statements have been prepared assuming that the Company will continue as a going concern. As disclosed in Note 1 to the financial statements, the Company had a negative working capital, has suffered a net loss from operations, negative cash flows from operating activities, and has a bank loan under a line of credit in default that raises an uncertainty about its ability to continue as a going concern. Management's plans with regard to these matters are also described in Note 1. The financial statements do not include any adjustments that might result from the outcome of this uncertainty. Our conclusion is not modified with respect to this matter.

*Mayer Hoffman McCann P.C.*

Los Angeles, California
June 13, 2019

**MAD DOGG ATHLETICS, INC.**

**BALANCE SHEET**

December 31, 2018

### A S S E T S

**CURRENT ASSETS**

| | | |
|---|---|---|
| Cash | $ | 245,958 |
| Accounts receivable | | 1,632,193 |
| Prepaid expenses | | 81,090 |
| Inventories | | 3,700,225 |
| Royalties receivable | | 869,013 |
| Due from stockholder | | 3,115 |
| Other current assets | | 482,127 |
| **TOTAL CURRENT ASSETS** | | 7,013,721 |
| PROPERTY AND EQUIPMENT, net | | 1,309,554 |
| INTANGIBLE ASSETS, net | | 2,660,619 |
| GOODWILL, net | | 318,847 |
| **TOTAL ASSETS** | $ | 11,302,741 |

### L I A B I L I T I E S

**CURRENT LIABILITIES**

| | | |
|---|---|---|
| Accounts payable | $ | 2,198,626 |
| Accrued expenses and other current liabilities | | 459,631 |
| Current portion of note payable to stockholder | | 7,267 |
| Current portion of notes payable to related party | | 32,000 |
| Line of credit | | 4,000,000 |
| Settlement liabilty | | 1,103,961 |
| **TOTAL CURRENT LIABILITIES** | | 7,801,485 |
| NOTE PAYABLE TO STOCKHOLDER, less current portion | | 25,436 |
| NOTE PAYABLE TO RELATED PARTY, less current portion | | 1,429,754 |
| **TOTAL LIABILITIES** | | 9,256,675 |

COMMITMENTS (NOTE 12)

### S T O C K H O L D E R ' S   E Q U I T Y

| | | |
|---|---|---|
| Common stock, $0.20 stated value, 100,000 authorized shares, 5,000 issued and outstanding | | 1,000 |
| Additional paid-in capital | | 1,098,000 |
| Retained earnings | | 894,169 |
| Accumulated other comprehensive income | | 52,897 |
| **TOTAL STOCKHOLDER'S EQUITY** | | 2,046,066 |
| **TOTAL LIABILITIES AND STOCKHOLDER'S EQUITY** | $ | 11,302,741 |

See Independent Accountants' Review Report and Notes to Financial Statements

**MAD DOGG ATHLETICS, INC.**

**STATEMENT OF OPERATIONS**

Year Ended December 31, 2018

| | | |
|---|---|---:|
| NET SALES | $ | 15,022,958 |
| COST OF GOODS SOLD | | 6,654,522 |
| GROSS PROFIT | | 8,368,436 |
| OPERATING EXPENSES | | 12,241,815 |
| OPERATING LOSS | | (3,873,379) |
| INTEREST EXPENSE | | 169,683 |
| NET LOSS | $ | (4,043,062) |

See Independent Accountants' Review Report and Notes to Financial Statements

EXHIBIT "4"

**MAD DOGG ATHLETICS, INC.**

## STATEMENT OF CHANGES IN STOCKHOLDER'S EQUITY

### Year Ended December 31, 2018

| | Common Stock | | Additional | Retained | Accumulated Other Comprehensive | Total Stockholder's |
| | Shares | Amount | Paid-In Capital | Earnings | Income | Equity |
|---|---|---|---|---|---|---|
| Balance, December 31, 2017 | 5,000 | $ 1,000 | $ 1,098,000 | $ 4,937,231 | $ 52,897 | $ 6,089,128 |
| Net loss | - | - | - | (4,043,062) | - | (4,043,062) |
| Balance, December 31, 2018 | 5,000 | $ 1,000 | $ 1,098,000 | $ 894,169 | $ 52,897 | $ 2,046,066 |

See Independent Accountants' Review Report and Notes to Financial Statements

- 5 -

**MAD DOGG ATHLETICS, INC.**

**STATEMENT OF CASH FLOWS**

Year Ended December 31, 2018

| | | |
|---|---|---:|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | |
| Net loss | $ | (4,043,062) |
| Adjustments to reconcile net income to net cash | | |
| flows from operating activities: | | |
| Depreciation | | 202,092 |
| Amortization | | 668,898 |
| Provision for doubtful accounts | | 1,400,292 |
| (Increase) decrease in operating assets: | | |
| Accounts receivable | | (763,637) |
| Prepaid expenses | | 21,343 |
| Inventories | | (275,041) |
| Royalties receivable | | 470,936 |
| Due from stockholder | | 137,671 |
| Other current assets | | (404,201) |
| Increase (decrease) in operating liabilities: | | |
| Accounts payable | | 824,849 |
| Accrued expenses and other current liabilities | | 229,099 |
| Settlement liability | | 1,103,961 |
| NET CASH FLOWS FROM OPERATING ACTIVITIES | | (426,800) |
| | | |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | |
| Purchase of intangible assets | | (965,801) |
| Purchase of property and equipment | | (146,719) |
| NET CASH FLOWS FROM INVESTING ACTIVITIES | | (1,112,520) |
| | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | |
| Proceeds from note payable to related party | | 1,461,754 |
| Net change in line of credit | | 300,000 |
| Repayments of note payable to stockholder | | (109,864) |
| Repayment of notes payable to related party | | (99,557) |
| NET CASH FLOWS FROM FINANCING ACTIVITIES | | 1,552,333 |
| | | |
| NET INCREASE IN CASH | | 13,013 |
| | | |
| CASH, beginning of year | | 232,945 |
| | | |
| CASH, end of year | $ | 245,958 |
| | | |
| **SUPPLEMENTAL CASH FLOW DISCLOSURES** | | |
| | | |
| Cash paid for: | | |
| | | |
| Interest | $ | 169,683 |
| | | |
| Non-cash investing and financing activities: | | |
| | | |
| Property acquired under note payable to stockholder | $ | 39,533 |
| | | |
| Property sold in exchange for due from stockholder | $ | 120,944 |

See Independent Accountants' Review Report

EXHIBIT "4"

## MAD DOGG ATHLETICS, INC.

## NOTES TO FINANCIAL STATEMENTS

**( 1 )    Nature of operations**

**Nature of operations** - Mad Dogg Athletics, Inc. (the "Company") is engaged in the worldwide retail and wholesale distribution of exercise equipment, fitness educational programs, and fitness products and accessories. The Company was incorporated in 1994 and is currently operating as an S Corporation.

In accordance with Accounting Standards Update ("ASU") 2014-07, *Applying Variable Interest Entities Guidance to Common Control Leasing Arrangements*, the Company does not consolidate Phoenix to LA, LLC, Second Decade, LLC, Avercary, LLC, and Syrac, LLC (the "Leasing Companies") in order to more appropriately reflect the relationship between the Company and commonly controlled leasing entities, and to reduce the cost of preparing the financial statements.

Note 13 states the debt obligations owed by the Leasing Companies with the principal balance, interest per annum, and final payment due. If the Leasing Companies defaulted under their debt. the Company expects it would provide support to the Leasing Companies in order to maintain access to the leased property, which is collateral for the debt. The debt is guaranteed by the Company, the stockholder of the Company and the Leasing Companies.

**Going concern** - As reported in the accompanying financial statements, the Company had a negative working capital of approximately $813,000 as of December 31, 2018, a net loss of approximately $4,043,000 and negative cash flows from operating activities of approximately $427,000 for the year ended December 31, 2018. The Company is also in default of their line of credit agreement (Note 8). Management plans to obtain support from the stockholder, in addition to improving its operations by reducing costs and eliminating operational inefficiencies. However, there is no guarantee the Company will not require additional funds in the future or that funds will be available on terms acceptable to the Company. In addition, on January 28, 2019, the Company lost a judgement and incurred a settlement liability for approximately $1,100,000. The Company's due date for the settlement liability is 20 days after the Arbitrator's Amended Award date of June 22, 2018. The Company is in the process of negotiating a lessor settlement, however there is no guarantee they will succeed (Note 11). These conditions raise substantial doubt about the Company's ability to continue as a going concern within one year after the release date of the financial statements for the year ended December 31, 2018. The financial statements do not include any adjustments that might result from the outcome of this uncertainty.

**( 2 )    Summary of significant accounting policies**

**Revenue recognition** - The Company recognizes revenue from product sales when the products are shipped, the customer takes ownership and assumes risk of loss, and collection of the relevant receivable is probable. Revenue from fitness educational programs is recognized upon the completion of the program. The Company recognizes revenues from royalties based on the contractual royalty rate when the licensed product is sold by the licensee. Net sales incorporate offsets for discounts and advertising allowances.

See Independent Accountants' Review Report

## MAD DOGG ATHLETICS, INC.

## NOTES TO FINANCIAL STATEMENTS

**( 2 )**  **Summary of significant accounting policies (continued)**

**Use of estimates** - The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America ("U.S. GAAP") requires management to make certain estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities as of the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

**Concentrations of credit risk** - Financial instruments that potentially subject the Company to concentrations of credit risk consist principally of trade accounts receivable, royalties receivable, accounts payable and uninsured cash balances.

The Company had uncollateralized accounts receivable with one customer with individual sales in excess of 10% of total accounts receivable as of December 31, 2018: a related party, Mad Dogg Athletics Europe B.V. ("Europe") (Note 13) which comprised approximately 42% of the Company's total accounts receivable.

Royalties receivable are due from three customers as of December 31, 2018. The Company requires no collateral from its customers and performs ongoing credit evaluations of its customers' financial condition.

The Company had one vendor from which it obtained greater than 10% of its annual purchases during the year ended December 31, 2018: a related party, Hart Wood, Inc. (Note 13) (11%) of the Company's total purchases.

The Company places its cash balances with what management believes are high credit quality financial institutions. At times, balances in the Company's cash accounts may exceed the Federal Deposit Insurance Corporation limit.

**Accounts receivable and credit policies** - Accounts receivable are uncollateralized customer obligations due under normal trade terms generally requiring payment within 30 to 60 days of invoice date. At times the Company may negotiate longer terms with specific customers.

Accounts receivable are stated at the amount billed to the customer. Customer account balances with invoices dated over the normal trade terms are considered delinquent. No accounts receivable are interest bearing. Payments of accounts receivable are allocated to the specific invoices identified on the customer's remittance advice or, if unspecified, are applied to the earliest unpaid invoices.

The carrying amount of accounts receivable is reduced by a valuation allowance that reflects management's best estimate of the amounts that will not be collected.

Management periodically reviews all accounts receivable balances and based on an assessment of current creditworthiness, estimates the portion, if any, of the balance that will not be collected.

See Independent Accountants' Review Report

EXHIBIT "4"

**MAD DOGG ATHLETICS, INC.**

**NOTES TO FINANCIAL STATEMENTS**

( 2 )    <u>Summary of significant accounting policies (continued)</u>

**Royalties receivable** - Royalties receivable consist of amounts due from domestic and international sales of the Company's license. Royalties are calculated on a quarterly basis and payment is due within 30 days after the end of the quarter. As of December 31, 2018, management has assessed that there is no need for a valuation allowance against the receivable.

**Inventories -** Inventories consist of finished goods and are stated at the lower of cost or net realizable value. Cost is determined using the first-in, first-out method. Finished goods include bikes, exercise equipment, fitness products and accessories.

**Depreciation** - Depreciation is computed using the straight-line method over the estimated following useful lives of the assets:

| <u>Assets</u> | <u>Useful Lives</u> |
|---|---|
| Furniture and fixtures | 7 years |
| Machinery and equipment | 7 years |
| Office equipment | 5 years |
| Vehicles | 5 years |

Maintenance and repairs are charged to expense as incurred. Major renewals and betterments are capitalized.

Leasehold improvements are amortized using the straight-line method over the term of the lease or estimated useful life, whichever is shorter.

**Website development costs** - The costs of website development during the planning stage as defined under Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") 350-50, *Website Development Costs*, are expensed as incurred. Website development costs incurred during the application and infrastructure development stage, including external direct costs of materials and services consumed in creating graphic and website content, are capitalized and amortized over the estimated useful life, beginning after all substantial testing is completed and the website is operational. Capitalized website development costs are included in intangible assets in the balance sheet as of December 31, 2018.

**Application development costs** - The costs of software application development during the preliminary project stage as defined under the ASC 350-40, *Internal-Use Software*, are expensed as incurred. Software application development costs incurred during the development stage are capitalized and amortized on a straight-line basis over the estimated useful life. Amortization for software for internal use begins when all substantial testing is completed. Capitalized software development costs are included in intangible assets in the balance sheet as of December 31, 2018.

**MAD DOGG ATHLETICS, INC.**

**NOTES TO FINANCIAL STATEMENTS**

**( 2 )    Summary of significant accounting policies (continued)**

**Impairment or disposal of long-lived assets** - The Company reviews its long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Recoverability of assets to be held and used is measured by a comparison of the carrying amount of an asset to the future net undiscounted cash flows expected to be generated by the asset. If such assets are considered to be impaired, the impairment to be recognized is measured by the excess of the carrying amount over the fair value of the assets. Assets to be disposed of are reported at the lower of carrying amount or fair value, less cost to sell. There were no asset impairments of property and equipment, intangible assets, and goodwill as of and for the year ended December 31, 2018.

**Advertising costs** - Advertising costs are expensed in the period in which the cost is incurred. Advertising costs charged to operating expenses for the year ended December 31, 2018 were $501,900.

**Shipping and handling costs** - Shipping and handling costs are included in cost of goods sold.

**Income taxes** - The Company, with its consent of its stockholder, has elected to be taxed under provisions of Subchapter S of the Internal Revenue Code. Under those provisions, the Company does not pay federal corporate income taxes on taxable income. Instead, the stockholder is liable for individual income taxes on the Company's taxable income. The Company pays state income taxes at a rate of 1.5% of state taxable income, or $800, whichever is greater. Management believes that the effect of the temporary differences are immaterial to the financial statements; accordingly, the 2018 financial statements do not include a provision for deferred taxes.

The Company follows the provisions of ASC Topic 740, *Income Taxes* ("ASC 740"), with respect to accounting for uncertain tax positions. ASC 740 prescribes a recognition threshold and measurement attribute for financial statement recognition and measurement of a tax position taken or expected to be taken in a tax return and also provides guidance on disclosures required. The Company has not identified any uncertain tax positions for the year ended December 31, 2018.

In the normal course of business, the Company is subject to examination by tax authorities. With few exceptions, the Company is no longer subject to U.S. federal income tax examinations by tax authorities for years before 2015. The Company is no longer subject to state of California tax examinations by tax authorities for years before 2014.

## MAD DOGG ATHLETICS, INC.

### NOTES TO FINANCIAL STATEMENTS

**( 2 )**    **Summary of significant accounting policies (continued)**

**Recently issued accounting pronouncements -** In May 2014, the Financial Accounting Standards Board ("FASB") issued the Accounting Standards Update ("ASU") 2014-09, Revenue from Contracts with Customers ("Topic 606"), and issued subsequent amendments to the initial guidance in August 2015, March 2016, April 2016, May 2016, and December 2016 within ASU 2015-14, ASU 2016-08, ASU 2016-10, ASU 2016-12, and ASU 2016-20, respectively. This guidance requires that entities recognize revenue to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. In July 2015, the FASB decided to delay the effective date of ASU 2014-09 by one year. As a result, non-public companies are required to apply the new standard to annual reporting periods beginning after December 15, 2018. Early adoption is permitted. Transition to the new guidance may be done using either a full or modified retrospective method. The Company is currently evaluating the full effect that the adoption of this standard will have on the Company's financial statements.

In February 2016, the FASB issued ASU 2016-02, Leases ("Topic 842"), and issued subsequent amendments to the initial guidance in January 2018, July 2018, July 2018, December 2018, and March 2019 within ASU 2018-01, ASU 2018-10, ASU 2018-11, ASU 2018-20, and ASU 2019-01, respectively. The amendments in these updates require lessees to recognize the following for all leases (with the exception of short-term leases) at the commencement date, a lease liability, which is a lessee's obligation to make lease payments arising from a lease, measured on a discounted basis; and, a right-of-use asset, which is an asset that represents the lessee's right to use, or control the use of, a specified asset for the lease term. The amendments in this update will be effective for the annual period beginning after December 15, 2019. Early adoption is permitted. The Company has yet to assess the full impact of this guidance.

**( 3 )**    **Acquisitions**

From October 2008 to April 2013, the Company acquired substantially all the identifiable net assets of Peak Pilates, LLC, Resist-a-Ball, LLC, and UGI Fitness, Inc. U.S. GAAP require that fair market value be used to recognize assets acquired and liabilities assumed in a business combination. Goodwill is calculated as the excess purchase price over the fair value of the net assets acquired. The Company did not properly evaluate the fair value of the assets and liabilities acquired and the consideration transferred in accordance with U.S. GAAP. Goodwill and intangible assets acquired are being amortized over 15 years representing the amortization period allowed for income tax purposes, which is not in accordance with U.S. GAAP. The effects of these departures from U.S. GAAP have not been determined.

**MAD DOGG ATHLETICS, INC.**

**NOTES TO FINANCIAL STATEMENTS**

**( 4 )**    <u>**Property and equipment**</u>

| | | |
|---|---|---:|
| Machinery and equipment | $ | 1,105,714 |
| Leasehold improvements | | 932,363 |
| Office equipment | | 954,999 |
| Furniture and fixtures | | 571,845 |
| Vehicles | | 63,841 |
| Total property and equipment | | 3,628,762 |
| Less accumulated depreciation | | (2,319,208) |
| Property and equipment, net | $ | 1,309,554 |

Depreciation expense charged to operations for the year ended December 31, 2018 was $202,092.

**( 5 )**    <u>**Intangible assets**</u>

Intangible assets are amortized using the straight-line method over the 15-year period allowed for income tax purposes which is not in accordance with U.S. GAAP. The effect of this departure from U.S. GAAP has not been determined. Intangible assets consist of the following as of December 31, 2018:

| | | Cost | | Accumulated Amortization |
|---|---|---:|---|---:|
| Amortized intangible assets: | | | | |
| Trademarks | $ | 4,101,216 | $ | 2,910,531 |
| Patents | | 1,097,876 | | 344,218 |
| Website and application | | 373,002 | | 93,865 |
| Manuals | | 138,600 | | 88,687 |
| Customer lists | | 205,000 | | 86,633 |
| Video library | | 302,774 | | 79,237 |
| DVD masters | | 69,275 | | 36,353 |
| Copyright | | 3,000 | | 1,100 |
| | | 6,290,743 | | |
| Accumulated amortization | | (3,640,624) | $ | 3,640,624 |
| Amortized intangible assets, net | | 2,650,119 | | |
| Unamortized intangible assets: | | | | |
| Domain names | | 10,500 | | |
| Intangible assets, net | $ | 2,660,619 | | |

**MAD DOGG ATHLETICS, INC.**

**NOTES TO FINANCIAL STATEMENTS**

**( 5 )    Intangible assets (continued)**

Amortization expense charged to operations for the year ended December 31, 2018 was $610,947. Estimated amortization expense for each of the next five years and thereafter is as follows:

Years Ending December 31,

| | | |
|---|---|---:|
| 2019 | $ | 403,067 |
| 2020 | | 390,883 |
| 2021 | | 376,570 |
| 2022 | | 334,632 |
| 2023 | | 246,514 |
| Thereafter | | 898,453 |
| | $ | 2,650,119 |

**( 6 )    Goodwill**

Goodwill is being amortized using the straight-line method over the 15-year period allowed for income tax purposes which is not in accordance with U.S. GAAP. The effects of this departure from U.S. GAAP have not been determined. The Company had goodwill of $318,847 as of December 31, 2018, net of accumulated amortization of $550,415.

Amortization expense charged to operations for the year ended December 31, 2018 was $57,951. Estimated amortization expense for each of the next five years and thereafter is as follows:

Years Ending December 31,

| | | |
|---|---|---:|
| 2019 | $ | 57,951 |
| 2020 | | 57,951 |
| 2021 | | 57,951 |
| 2022 | | 57,951 |
| 2023 | | 57,951 |
| Thereafter | | 29,092 |
| | $ | 318,847 |

**MAD DOGG ATHLETICS, INC.**

**NOTES TO FINANCIAL STATEMENTS**

**( 7 )    Accrued expenses and other current liabilities**

Accrued expenses and other current liabilities as of December 31, 2018 consist of the following:

| | | |
|---|---|---:|
| Customer deposits | $ | 360,719 |
| Accrued vacation payable | | 74,679 |
| Sales tax payable | | 18,484 |
| Other accrued expenses | | 5,749 |
| Accrued expenses and other current liabilities | $ | 459,631 |

**( 8 )    Note payable to stockholder**

Note payable to stockholder for vehicle loan - Under the terms of the loan, the Company is obligated to pay $39,533 (interest and principal of $785 payable monthly). The loan bears interest at 6.99% per annum, matures on July 22, 2023, subordinated to the line of credit, and is collateralized by a security interest in a vehicle.

| | | |
|---|---|---:|
| | | 32,703 |
| Less current portion | | (7,267) |
| Noncurrent portion | $ | 25,436 |

Annual maturities of the notes payable to the note payable to stockholder are as follows:

| | | |
|---|---|---:|
| 2020 | | 7,267 |
| 2021 | | 7,267 |
| 2022 | | 7,267 |
| 2023 | | 3,635 |
| | $ | 32,703 |

See Independent Accountants' Review Report

## MAD DOGG ATHLETICS, INC.

## NOTES TO FINANCIAL STATEMENTS

**( 9 )**    **Notes payable to related parties**

Note payable to Syrac, LLC matures on September 12, 2043. The Company is obligated to pay accrued interest and principal on the date of maturity. The note bears interest at 2.35%+LIBOR. The interest rate was 5.1% as of December 31, 2018. The note is subordinated to the line of credit, and collateralized by membership interests in the Company and a security interest in substantially all of the assets of the Company.                                              $      1,429,754

Note payable to Avercary, LLC due on demand. The note does not bear interest.                                                                                        32,000

|  |  |
|---|---|
| Total notes payable to related parties | 1,461,754 |
| Less current portion | (32,000) |
| Noncurrent portion | $      1,429,754 |

Annual maturities of the notes payable to related parties are as follows:

|  |  |
|---|---|
| 2023 | - |
| Thereafter | 1,429,754 |
|  | $      1,461,754 |

Note payable to stockholder for vehicle loan - Under the terms of the loan, the Company is obligated to pay $39,533 (interest and principal of $785 payable monthly). The loan bears interest at 6.99% per annum, matures on July 22, 2023, subordinated to the line of credit, and is collateralized by a security interest in a vehicle.                    32,703

**( 10 )**    **Line of credit**

Under an amended revolving line of credit agreement, the Company may borrow up to $4,000,000. Interest is payable monthly at the LIBOR rate plus 2% per annum. As of December 31, 2018, the balance outstanding on the line of credit was $4,000,000. The interest rate was 4.75% as of December 31, 2018. The line of credit agreement, collateralized by a security interest in substantially all of the assets of the Company, contains various financial covenants, and is personally guaranteed by the stockholder, and a related living trust. The maturity date was March 1, 2019.

During the year ended and as of December 31, 2018, the Company was not in compliance with certain financial covenants and is in default on the agreement. The interest rate following default is 5% in excess of the specified rate.

See Independent Accountants' Review Report

**MAD DOGG ATHLETICS, INC.**

**NOTES TO FINANCIAL STATEMENTS**

**( 10 )  Line of credit (continued)**

On March 27, 2019, the Company obtained a Notice of Default of Obligations and Forbearance, which allowed extension of the repayment of the loan until earlier of i) September 1, 2019 ii) upon the Company's failure to meet any of the conditions of the agreement or the occurrence of any Event of Default under the loan documents, or iii) any condition, act, or event, with which the giving of notice or the passage of time or both would consist of an Event of Default under the Loan Documents ('Forbearance Period"). The bank will forbear from exercising its rights and remedies against the Company only if: (a) commencing on March 31, 2019, the Company shall pay $500,000 which shall be applied towards the reduction of principal, in monthly installments of $100,000 starting on March 31, 2019 until July 31, 2019, (b) on or before April 30, 2019, the Company shall furnish the revised financial statements for the fiscal quarter ended September 30, 2018 and financial statements for the fiscal year ended December 31, 2018, (c) the Company shall furnish monthly financial statements commencing with January 31, 2019, and (d) on or before April 30, 2019, the Company shall furnish projections for the 2019 fiscal year. The Company has not met any of the remedies and is not in compliance with the forbearance agreement.

**( 11 )  Settlement liability**

On January 11, 2017, Hymanson, Inc. dba Bodyblade ("Hymanson") filed a demand in arbitration against the Company seeking a total of $2 million for a variety of disputes and claims related to the Company's marketing and sales of Bodyblade products pursuant to a Distribution and Licensing Agreement. During 2018, several hearings took place for both parties to call witnesses and present documentary evidence of the claims. In accordance with the Arbitrator's Amended Award dated June 22, 2018 and the court order dated October 18, 2018, a judgment was entered for and in favor of Hymanson by Superior Court of California, County of Los Angeles on January 28, 2019. The judgment included the following: 1) the Company shall pay total monetary damage of $865,388, 2) the Company is to transfer the remaining Bodyblade inventory and related products to Hymanson, and 3) the Company shall pay pre-judgment interest of $238,573 to Hymanson. Also, interest will accrue on the principal amount of $865,388 at a rate of 10% per annum from the date of the entry of judgment until paid in full. The Company included $1,103,961 (principal and pre-judgement interest) as a settlement liability on the balance sheet as of December 31, 2018, and it is included in operating expenses in the statement of operations for the year ended December 31, 2018. The Company's due date for the settlement liability is 20 days after the Arbitrator's Amended Award date of June 22, 2018. On April 29, 2019, Hymanson filed a notice of judgement lien against the Company seeking collection on the amount awarded. The Company is in the process of negotiating a lesser settlement, however there is no guarantee they will succeed.

**( 12 )  Commitments**

**Operating leases** - The Company leases four Los Angeles facilities from commonly controlled entities under non-cancelable operating leases with related parties Phoenix to LA, LLC, Second Decade, LLC, Avercary, LLC and Syrac, LLC. These leases were extended and will expire at various times throughout 2037, and include varying renewal options. The leases provide for annual rent increases based on the Consumer Price Index. The Company also leases an office space from a third party under month-to-month terms.

See Independent Accountants' Review Report

**MAD DOGG ATHLETICS, INC.**

**NOTES TO FINANCIAL STATEMENTS**

**( 12 )  Commitments (continued)**

Future minimum lease commitments (exclusive of real estate taxes, maintenance, etc.), are as follows:

Years Ending December 31,

| | |
|---|---:|
| 2019 | 672,000 |
| 2020 | 672,000 |
| 2021 | 672,000 |
| 2022 | 672,000 |
| 2023 | 672,000 |
| Thereafter | 9,408,000 |
| | $   12,768,000 |

Total lease expense charged to operations was $662,352, for the year ended December 31, 2018.

**( 13 )  Related party transactions**

**Leasing transactions** - The Company leases its facilities from commonly controlled Leasing Companies (Note 1), which are all single member limited liability companies owned by the Company's stockholder. The Company also has a note payable to Syrac, LLC and Avercary, LLC (Note 10). The Company, in addition to the Company's stockholder and related living trust, is a guarantor of the debt obtained for the acquisition of each of the Leasing Company's properties (Note 1). The debt is also collateralized by the property leased by the Company. If the Company were required to honor the guarantees, it would be entitled to the property owned by the Leasing Companies that collateralize the loan. The following notes the terms of the notes owed by the Leasing Companies:

| | Due Date | Balance at Inception | Interest Rate Per Annum |
|---|---|---|---:|
| Phoenix to LA, LLC | | | |
| Trust deed note payable | January 1, 2032 | $    2,506,661 | 4.33% |
| Second Decade, LLC* | | | |
| Trust deed note payable | January 1, 2032 | $    2,108,000 | 4.42% |
| Avercary, LLC* | | | |
| Trust deed note payable | February 1, 2032 | $    2,451,446 | 4.35% |
| Trust deed note payable | December 1, 2030 | $    1,296,000 | 3.78% |
| Syrac, LLC | | | |
| Trust deed note payable | September 12, 2043 | $    2,750,000 | Libor+2.35% |

See Independent Accountants' Review Report

- 17 -
EXHIBIT "4"

**MAD DOGG ATHLETICS, INC.**

**NOTES TO FINANCIAL STATEMENTS**

**( 13 )**  **Related party transactions (continued)**

The Company is also required to maintain a minimum cash flow to debt service ratio for certain notes above. Management has determined that the Company is in compliance with this covenant.

**Other related party transactions** - Europe is a related party that is 100% owned by the stockholder of the Company. The Company distributes fitness products and accessories to Europe, and also reimburses Europe for expenses primarily for the use of a customer service representative. For the year ended December 31, 2018, sales to Europe were $702,402. Amount due from Europe as of December 31, 2018 was $680,857 and included within accounts receivable.

Hart Wood, Inc. is a related party that is 100% owned by the Company's stockholder and manufactures Peak Pilates equipment. Purchases from Hart Wood, Inc. were $2,697,938 for the year ended December 31, 2018.

The Spinning Group is a related party that is 100% owned by the Company's stockholder and is a studio used for leasing purposes. Fees paid to The Spinning Group were $579,000 for the year ended December 31, 2018.

Avery, LLC is a single member LLC owned by the Company's stockholder. The Company's stockholder and a related living trust is a guarantor of the debt for the acquisition of real estate by Avery, LLC as follows:

|  | Due Date | | Balance at Inception | Interest Rate Per Annum |
|---|---|---|---|---|
| Trust deed note | February 1, 2033 | $ | 850,000 | 3.89% |
| Trust deed note | February 13, 2033 | $ | 701,000 | 2.25% |

The Company is also required to maintain a minimum cash flow to debt service ratio for certain notes. Management has determined that the Company is in compliance with this ratio.

**( 14 )**  **License agreements**

The Company pays royalties under license agreements with several entities with royalty rates ranging from 3% to 6% of sales of certain products. The licensors' portion of the shared revenues are accrued monthly, and paid quarterly. The licensors have indemnified the Company against product liability claims resulting from the sale of the products and any claims or damages against the Company.

## MAD DOGG ATHLETICS, INC.

## NOTES TO FINANCIAL STATEMENTS

**( 15 )**  <u>Retirement plans</u>

**401(k) Profit sharing plans** - The Company has two qualified profit sharing plans for eligible employees. The Mad Dogg Athletics, Inc. 401(k) Profit Sharing Plan is for all eligible employees that are also part of the Company's defined benefit pension plan. The Mad Dogg Athletics, Inc. 401(k) Profit Sharing Plan #2 is for all remaining eligible employees. The plans' contributions are made at the discretion of the Company. The Company did not make any contributions for the year ended December 31, 2018.

**Defined benefit plan** - The Company has a defined benefit pension plan for eligible employees. Pension benefits are based on years of service and the employee's highest average compensation during a three-year consecutive period. Contributions are intended to provide not only for benefits attributed to service to date, but also for those expected to be earned in the future. The annual measurement date is December 31 for the plan. The plan was frozen to new participants effective May 10, 2012. Contributions continue to be funded and benefits continue to accrue to active participants but no new participants can enter the plan subsequent to May 10, 2012.

U.S. GAAP related to defined benefit plans require the full funding status of the plan to be recognized on the balance sheet as an asset, for overfunded plans, or a liability, for underfunded plans, and net periodic pension cost based on the present value of the benefit obligation is to be recognized as an expense. In addition, the actuarial gain or loss and/or prior service cost or credit are to be recognized as components of other comprehensive income for the period, as are reclassification adjustments, and accumulated other comprehensive income should include such amounts not yet recognized as components of periodic expense. Additionally, the net periodic pension cost has not been determined or recorded in the income statement, nor the benefit obligation, the fair value of plan assets, reconciliation of their beginning and ending balances, and the assumptions used in determining such amounts.

Certain disclosures regarding the fair value of plan assets including major categories of plan assets and their fair values, fair value measurements, and related investment policies and strategies, the basis for assumptions regarding long term rates of return and assets to be returned to the Company within the next twelve months, and accumulated other comprehensive income expected to be recognized as a component of expense for the 2018 year-end have not been made. The effects of these departures from U.S. GAAP on the financial position, results of operations, and cash flows have not been determined.

**( 16 )**  <u>Subsequent events</u>

The Company has evaluated subsequent events through June 13, 2019, which is the date the financial statements were available to be issued.

See Independent Accountants' Review Report

**PROOF OF SERVICE OF DOCUMENT**

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 18101 Von Karman Avenue, Suite 1200, Irvine, CA 92612.

A true and correct copy of the foregoing document entitled (*specify*): **OMNIBUS REPLY IN SUPPORT OF HYMANSON, INC. DBA BODYBLADE'S MOTION FOR ORDER UNDER 11 U.S.C. §§ 503(B)(3)(B) FOR AUTHORIZATION TO PURSUE ACTIONS (AND OBTAIN COMPENSATION FROM ESTATE) AGAINST THE FOLLOWING FOR THE BENEFIT OF THE ESTATE: 1. JOHN BAUDHUIN, AN INDIVIDUAL; 2. SYRAC, LLC; 3. HART WOOD INC.; 4. MAD DOGG ATHLETICS EUROPE; 5. SPINNING GROUP, INC.; 6. AVERCARY, LLC; 7. PORSCHE FINANCIAL SERVICES; 8. SECOND DECADE LLC; 9. PHOENIX TO LA, LLC, AND 10. ANY OTHER INSIDERS; DECLARATION OF KENNETH D. WATNICK FILED IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF):** Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) January 16, 2020, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒    Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) January 16, 2020, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows: Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

**Arent Fox LLP,** 555 West Fifth Street, 48th Floor, Los Angeles, CA 90013
**KeatsgGtien LLP,** 120 S. El Camino Drive, Suite 207, Beverly Hills, CA 90212

☐    Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL**: (state the method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) January 16, 2020, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows: Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

- The Honorable Julia W. Brand, USBC, 255 E. Temple Street, Los Angeles, CA 90012

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| January 16, 2020 | Susan C. Stein | /s/Susan C. Stein |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

16

**TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF):**

- **Philip A Gasteier    pag@lnbrb.com**
- **Robert P Goe    kmurphy@goeforlaw.com, rgoe@goeforlaw.com;goeforecf@gmail.com**
- **Asa S Hami    ahami@sulmeyerlaw.com,
  pdillamar@sulmeyerlaw.com;pdillamar@ecf.inforuptcy.com;cblair@sulmeyerlaw.com;ahami@ecf.inforuptcy.com**
- **Brian T Harvey    bharvey@buchalter.com,
  IFS_filing@buchalter.com;dbodkin@buchalter.com**
- **Andy Kong    Kong.Andy@ArentFox.com**
- **David S Kupetz    dkupetz@sulmeyerlaw.com,
  dperez@sulmeyerlaw.com;dperez@ecf.courtdrive.com;dkupetz@ecf.courtdrive.com**
- **Elizabeth A LaRocque    kmurphy@goeforlaw.com, elarocque@goeforlaw.com**
- **Dare Law    dare.law@usdoj.gov**
- **Daniel A Lev    dlev@sulmeyerlaw.com,
  asokolowski@sulmeyerlaw.com;dlev@ecf.inforuptcy.com;dwalker@sulmeyerlaw.com**
- **Elan S Levey    elan.levey@usdoj.gov, louisa.lin@usdoj.gov**
- **Aram Ordubegian    ordubegian.aram@arentfox.com**
- **Allan D Sarver    ADS@asarverlaw.com**
- **Cathy Ta    cta@sulmeyerlaw.com, dperez@sulmeyerlaw.com;cblaire@sulmeyerlaw.com**
- **United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov**
- **Steven Werth    swerth@sulmeyerlaw.com,
  cblair@sulmeyerlaw.com;mviramontes@sulmeyerlaw.com;swerth@ecf.inforuptcy.com**
- **Christopher K.S. Wong    christopher.wong@arentfox.com, yvonne.li@arentfox.com**